The American Freehold Land Mortgage Company of London
v. Charles Pace et al.

Decided March 28, 1900.

1. **Limitation—Reformation of Deed.**

Action for reformation of a trust deed on account of fraud or mistake in description of the land embraced, is not barred when brought within four years from the execution of the instrument, though it was a renewal of a similar deed given more than four years before suit and containing the same misdescription.

2. **Same—Discovery of Mistake—Diligence.**

The law prescribes no definite time within which failure to discover and sue to correct mistake or fraud will subject the action to the bar of limitation or to a plea of stale demand, in the absence of facts putting the complaining party on inquiry.

3. **Same—Notice from Terms of Deed.**

Negligence in failing to ascertain, from the terms of the deed itself, fraud or mistake in the description of property embraced, will not prevent an action for its reformation on discovery of the error where it was executed in reliance upon the statement of the opposite party, who had prepared the instrument, as to its contents.

**4. Same—Registration—Notice.**

Registration laws are for the purpose of notice of the instruments to subsequent purchasers or incumbrancers, and not to the parties executing them, and the latter are not chargeable with notice by the record of the terms of deeds signed by them upon misrepresentation as to their contents.

**5. Reformation of Deed—Mistake—Evidence.**

See evidence held sufficient to support a finding that a trust deed was executed in mistake as to the land embraced and a decree for its reformation.

**6. Same—Necessary Proof.**

It is not necessary, in order to reform a deed, that mistake therein be established beyond a reasonable doubt, nor by more than one witness, but only that the evidence should be reasonably satisfactory to the jury, who are the judges of its weight.

**7. Homestead—Designation.**

The husband alone can not, under the form of a designation of the homestead from a larger tract, transfer the exemption to uncultivated land, and subject to a mortgage the actual homestead which he continues to occupy and cultivate as such.

**8. Reformation of Deed—Description of Land.**

See pleadings and evidence held to show the boundaries intended to be embraced in a trust deed sought to be reformed for mistake in description with sufficient precision to sustain a decree for its reformation. (KEY, J., dissenting.)

APPEAL from Travis. Tried below before Hon. F. G. MORRIS.

Special charge number 3, requested by plaintiff in the trial court, was as follows: "You are instructed that unless the defendants Pace and wife established mutual mistake or fraud on the part of plaintiff in the execution of the deed of trust by a preponderance of the testimony, you will find for plaintiff on these issues."

The following was applicant's thirteenth assignment of error: "The court erred in not granting the motion of plaintiff for a new trial and setting aside the verdict and judgment rendered herein, because by said judgment the court refused to enter judgment upon that part of the verdict awarding to plaintiff the rental value of the land withheld from it by defendants, to which rents plaintiff was entitled according to the terms of the deed of trust, as well as according to the charge of the court, and which should have been applied as a credit on the rents adjudged against the plaintiff."

*T. W. Gregory* and *Geo. F. Pendexter,* for appellant.

*Hogg & Robertson,* for appellees.

FISHER, CHIEF JUSTICE.—This suit was instituted by the appellant March 23, 1896, against appellees Charles Pace and wife Jessie Pace, and one W. H. Richardson, upon a note of date February 20, 1893, executed by Charles Pace and due November 1, 1896, and to foreclose a deed of trust executed at the same time by Pace and wife upon certain lands therein described, to secure said note.

The description of the land, as given in the deed of trust and as stated in appellant's petition, is as follows:

"Three hundred (300) acres, more or less, a part of the T. Bissell league, beginning at the N. W. line of said league, at the N. corner of said J. R. Pace tract and W. corner of W. L. Staniforth tract. Thence S. 60 E. 1036 vrs., with Staniforth line, to Ziveley's corner; thence to Ziveley's corner; thence south 50 W. 42 vrs.; thence south 80 W. 265 vrs. up the creek; thence south 49 E. 585 vrs.; thence north 40 E. 570 vrs. (said six lines last mentioned being boundaries of the 56 acres forming part of our homestead); thence south 60 E. 987 vrs., with Beckett's line, to N. corner of Stanley's 60-acre tract; thence south 30 W. 720 vrs.; thence S. W. 343 vrs.; thence south 60 E. 433 vrs. to the Bissell league line; thence south 30 W. to the south corner of the James R. Pace tract; thence north 60 W. to the south corner of the D. C. Pace's 105-acre tract; thence with D. C. Pace's line north 50 E. 430. vrs. and north 19 E. 690 vrs. to the creek, a corner of said 56-acre tract; thence westerly with the creek to D. C. Pace's west corner; thence north 60 W. to the Bissell N. W. line; thence N. 30 E. 1131 vrs. to the beginning; excepting therefrom 144 acres, forming a part of our homestead, bounded on the N. E. by the dividing line 987 vrs. long, between our land and Beckett's, on the south E. by Stanley's 60-acre tract; on the N. W. by said 56-acre tract; and on the S. W. by a line parallel to said 987-vara line, at such a distance from it as will include 144 acres; which said deed of trust bears date 20th February, 1893, and was on the 10th day of May, A. D. 1893, duly recorded in vol. 109, page 188, etc., of the mortgage records of Travis County, State of Texas."

On the 21st day of November, 1896, Charles Pace and wife filed their first amended original answer, in which the liability of Charles Pace on the note was admitted, and in which it was also asked that the deed of trust and a certain instrument executed by Pace designating appellees' homestead be reformed so as to correct the description of the land which was excepted from the operation of the deed of trust. This relief is based upon allegations to the effect that by a mutual mistake of all the parties to these instruments of writing, or by reason of the fraudulent and wrongful conduct of J. Gordon Brown and R. L. Brown, the former the payee named in the note and the latter the trustee named in the deed of trust, the instruments did not correctly describe the 144 acres which the parties agreed and understood and intended should be excepted from the operation of the lien created by the deed of trust. Instead of being as described in the deed of trust, that instrument should have described a different tract of land out of the southeast end of the tract described in the deed of trust, which is as follows:

"That the said homestead tracts of land, embracing 200 acres, and which was to be designated as the homestead of these defendants, and was not to be covered by said lien, it was agreed, as aforesaid, should be described as follows, to wit: Two tracts of land out of the James R. Pace original tract in the T. Bissell league in the county of Travis and State of Texas; (1) 56 acres, the same conveyed to Chas. Pace

by R. E. White and wife, by deed dated July 5, 1881, recorded in the said Travis County deed records in book 51, page 112, here referred to for description, whereon the home and residence of these defendants was situated; (2) 144 acres described as follows, to wit: Bounded on the west by D. C. Pace's 105-acre tract; on the south by the original south line of the James R. Pace survey; on the east by the Nolan tract and the 60-acre tract of Stanley; and on the north by a line running parallel with the south line of this tract at a sufficient distance north of said south line to give 144 acres, which north line of this tract is also parallel with the 987-vara line on the south of Beckett's tract mentioned in said deed of trust."

Defendant Richardson filed an answer disclaiming any interest in the property in controversy.

November 21, 1896, the appellant filed a supplemental petition interposing a general demurrer to appellees' answer, and also specially excepted to the same because it did not, with sufficient certainty, describe the 144 acres which was intended to be reserved from the operation of the deed of trust, and the appellees were barred in their remedy by the operation of the four years statute of limitation and stale demand and laches; and pleaded a general denial, and specially, that, on or about February 26, 1887, appellee Charles Pace executed and acknowledged a homestead designation, setting apart and describing as his homestead the 56-acre tract and the 144 acres described in plaintiff's petition; and that the same was immediately recorded in the proper records of the county used for that purpose; and that at the same time Charles Pace and wife executed and acknowledged and delivered to the plaintiff the original deed of trust to secure the note sued on, describing the 56-acre tract and the 144 acres as his homestead, as described in the petition; and that the deed of trust was immediately recorded in the records of the county used for recording such instruments; and that the deed of trust sued upon, which was executed February 20, 1893, contained the same description as stated in the two instruments above mentioned (this deed of trust was recorded May 10, 1893); that if any cause of action existed to reform the deed of trust in question on the ground of mistake or fraud, it arose when the first two described instruments were executed, to wit, February 26, 1887, and is therefore barred by the statute of four years limitation; that if any fraud was committed or mistake made concerning the description of the land, the right to reform the deed of trust has become stale; and that by reason of the laches and negligence of appellees they are barred in their remedy in that they could and should, before signing the instruments, have read the same, which they negligently failed to do; and as there was no confidential or fiduciary relationship existing between them and the Browns, the agents of the plaintiff who negotiated the transaction, they should not have relied upon their representations; and that the mistake or fraud, if it ever existed, could and should have been sooner

discovered; that the record of the instruments, as above stated, was notice to the appellees as to what lands were described in these instruments, and thereby furnished the means of discovering the error in description, and that the appellees were wanting in diligence in failing to sooner make such discovery and instituting the action to reform.

February 23, 1899, appellees filed their first supplemental answer, in effect alleging that, under a pretended judgment foreclosing the deed of trust sued upon and a purchase of the land therein described at foreclosure sale by the plaintiff, which judgment has subsequently been annulled and set aside, the plaintiff went into actual possession of the land described in the deed of trust, using and enjoying the rents and profits thereof, which are reasonably worth $1000, for which amount appellees ask judgment.

To this relief appellant, by supplemental petition, responded, that, by virtue of the terms of the deed of trust, upon default in payment, plaintiff or the trustee mentioned in the instrument was authorized to enter upon and take possession of the premises described in the deed of trust; and that the appellant is only responsible to appellees for the sum of $145.20, it being the amount of rents received and collected with due diligence by appellant when in possession of the premises; and, further, that the appellees had been in the possession, use and enjoyment of 144 acres of the land covered by the deed of trust, in the event it should be reformed, and that the rental value thereof is equal to the rental value of the lands which appellant has been in possession of, and asked that, if it be found liable for rents, the two claims for rent be offset.

The case was submitted to a jury, and verdict found in favor of appellant for the amount of the note, principal, interest, and attorneys fees, and the sum of $288, the rental value of the land which should have been but was not covered by the deed of trust; and in favor of appellees, Pace and wife, as to the issue seeking a reformation of the deed of trust as to the description of the land which was exempted from its operation; and that the failure of the instrument to correctly describe the land was the result of a mutual mistake of both parties to the instrument; and found in favor of appellees the sum of $832 as the rental value of the lands wrongfully held in possession by appellant.

The decree entered upon the verdict was to the effect that the deed of trust be so reformed as to except from its operation the 144 acres in controversy, describing and locating it as stated in appellees' answer; and that it, with the 56-acre tract, be excluded from the operation of the deed of trust as the homestead of the appellees, with a decree foreclosing the deed of trust upon all of the remaining lands described in that instrument, applying it also to that part of the survey, which, according to the terms of the instrument, by mistake, was described as the 144 acres which was reserved by appellees as a part of their homestead.

Judgment was also rendered in appellees' favor for $832 as the rental value of the land in possession of appellant. The court refused to render judgment in appellant's favor for the amount of $288 found by the

verdict as the rental value of the lands which should have been, but were not covered by the deed of trust. From this judgment the appellant prosecutes its appeal.

We find the following facts: That appellee Pace executed the note described in plaintiff's petition, and is bound and liable therefor for the amount stated in the judgment of the court. On the 26th of February, 1887, Charles Pace executed to J. Gordon Brown a promissory note for the sum of $1500, borrowed money, and to secure the payment of the same, the appellees, Charles Pace and wife, at the same time, executed a deed of trust upon the lands described in the plaintiff's petition; and about the same time and as a part of the transaction in executing the note and the deed of trust, Charles Pace signed and executed an instrument, which purports to be a homestead designation, wherein the following lands are described and mentioned as his homestead: "Two tracts of land out of the Jas. R. Pace original tract in the T. Bissell league, in the county of Travis and State of Texas, being (1) 56 acres, the same conveyed to me by R. E. White and wife, by deed dated July 5, 1881, recorded in the records of Travis County, book 51, page 112, and here referred to for description, whereon my home and residence are situated; (2) 144 acres lying east of said White tract, bounded on the northeast by the 987-vara line dividing my land from Beckett's tract; on the southeast by Stanley's 60-acre tract; on the northwest by the 56-acre tract bought by me from R. E. White, and D. C. Pace's 105-acre tract; and on the southwest by a line parallel to said 987-vara line at such a distance from it as to include 144 acres."

This deed of trust and the homestead designation were properly acknowledged and recorded in the county records of Travis County on the day of their execution. The deed of trust, in giving the description of the land reserved from its operation as the homestead of appellees, practically describes the same land that is above described in the homestead designation.

In lieu of the note and deed of trust as above stated, Chas. Pace, on the 20th of February, 1893, executed the note sued upon; and at the same time appellees executed the deed of trust foreclosed in this suit, which was executed for the purpose of securing the note in suit, and embraced the lands described in the plaintiff's petition. This instrument was properly acknowledged, and was duly recorded in the mortgage records of Travis County on the 10th day of May, 1893, and practically describes the homestead of the appellees which was reserved from the operation of the deed of trust as the same description as given in the homestead designation executed by Pace, as heretofore set out. The note sued upon was executed and delivered by Pace to J. Gordon Brown, and the deed of trust last described, which was executed to secure the same, was in favor of R. L. Brown, as trustee. Both of the Browns, at the time of the execution of the instruments previously described and at the time of the execution of the instruments last described, and during the time of all the negotiations and transactions testified to by the

witnesses, were the agents of the appellant, who is admitted to be bound by the acts and conduct of the Browns in and concerning the various transactions disclosed by the record.

All of the entire tract of land described in the deeds of trust, including that portion subject to the same, as well as that part which was or should have been reserved from the operation of these instruments as the homestead of appellees, embraces about 496 acres of land; and it reasonably appears, from evidence found in the record as well as the description given in the homestead designation, and in the description given of the lands mentioned in the deed of trust; that all of this 496 acres was originally a part of the James R. Pace survey, which was a part of the Bissell league.

The homestead designation describes a part of this 496 acres which is set apart as the homestead as a part of the James R. Pace original tract in the T. Bissell league. The deed of trust describes the land as a part of the Bissell league, "beginning at the northwest line of the league, at the northwest corner of the said J. R. Pace tract." Then, further on, there is a call, "thence south 30 west to the south corner of the James R. Pace tract," clearly indicating that the land lying between the north corner of the James R. Pace tract and the south corner of the James R. Pace tract, is a part and parcel of the James R. Pace survey. Pace testified: "I own 496 acres on the James R. Pace tract, including the 56 acres which I bought from Emmett White," evidently meaning that the 496 acres here mentioned is the entire tract of land described in the deed of trust, which instruments were intended only to incumber 300 acres of this tract.

In order to fully understand the description of the land covered by the deed of trust, and as an aid in identifying the land which appellees contend was to be excepted from the operation of the deed of trust, and which they intended to set apart as a part of their homestead, we here refer to the following plat giving a description of the boundaries of the land, and showing the location of the different surveys adjacent thereto; which map, with the figures, lines, and written matter therein contained, we find correctly sets out and describes the location of the lands described in the deed of trust, and correctly describes the lines of the surveys therein mentioned, and correctly states the 144 acres of land which was intended by all the parties to the deeds of trust to be excluded from their operation, and which was intended should have been described as a part of the homestead of appellees; and we find that this 144 acres is a part of the James R. Pace survey out of the southeast corner of the 496 acres owned by Pace at the time the deeds of trust were executed, which does not include the Nolan tract, as shown on the map. The map or plat is as follows:

· The lower survey line as given on the map is the line of the James R. Pace survey. The survey marked "Nolan tract" was originally part of the James R. Pace survey. The lines and boundaries of the Nolan survey are not given or shown, other than as stated on the map; but we find from the evidence of witness Wallace that this map is correct in stating the lines of the Nolan survey. We find from the evidence of witness Pace that the lines of the Nolan are recognized and agreed upon between him and the present owner of the Nolan survey.

We need not make any finding with reference to the 56-acre tract, marked on the map as "Chas. Pace," for there is no controversy about this tract, as it is conceded it was a part of the homestead of Pace and is not incumbered with the deeds of trust; and it is conceded that there was no mistake made in the description of this tract, but the controversy arises as to the location and description of the 144 acres, the balance necessary to make up appellees' homestead.

The deeds of trust, as to the 144 acres which was exempted from their operation as a part of the homestead of the appellees, locate the same adjoining and east of the 56-acre Charles Pace tract, as shown on the map, and along with and south of the Beckett line, and extending east to the west line of the Stanley tract, as shown on the map, as far south as the red line, as shown on the map, which line represents the south line of the 144 acres given in the homestead designation and in the deeds of trust as a part of the homestead of appellees.

We find that before and at the time that the original deed of trust was executed, in 1887, there was an understanding and agreement between Charles Pace, who acted for himself and his wife, and the Browns, that the homestead of appellees should embrace the 56-acre tract and 144 acres out of the southeast corner or end of the 496-acre tract owned by Pace; and in this connection it is well to state that Charles Pace testified that it was not to include the Nolan tract. This 144 acres was not to include any part of the D. C. Pace 105-acre survey, which it is admitted is not covered by the deeds of trust. It was agreed that this 144 acres should be reserved from the operation of the deed of trust.

At that time, the appellees had in cultivation, using and enjoying the same as a part of their rural homestead, about 100 acres of land, about 20 acres of which was on the Charles Pace 56-acre survey, and the balance was principally located in the southeast end of the 496-acre tract; and it was agreed that the lines of the 144 acres were to be so run as to take in the cultivated lands in the southeast end of the 496-acre tract. It was agreed that the lines of the 144 acres should run so far north as to take in and embrace appellees' cultivated land. And in this connection we find that the substantial effect of the agreement as to the location of the 144 acres which should be reserved to the appellees was that it would include and embrace the 144 acre tract substantially as described in appellees' answer and the judgment of the court. This 144 acres would not include and was not intended to

include any of the D. C. Pace 105-acre tract, nor the Nolan tract, and would embrace all of the land south of the 1618 2/5-vara black line, as shown on the map, excluding the Nolan and the D. C. Pace.

The appellees at that time had their dwelling and residence upon the Charles Pace 56-acre tract. The most of their cultivated land was upon the 144 acres south of the black line, as shown on the map, and as described in the judgment of the court as the land which was intended to be excepted from the operation of the deed of trust. This cultivated land at the time was used and occupied and enjoyed and cultivated by Pace and wife as a part of their rural homestead. The deed of trust as reformed by the judgment of the court separates this 144 acres from the 56-acre tract a short distance, as will appear from the map.

The Browns, the agents of appellant, were intrusted with the preparation of the deed of trust and the homestead designation, and with the duty of correctly describing the lands that should be embraced in these two instruments. These instruments were prepared by the Browns or under their direction; and it was understood that the description of the land that should be covered by the deed of trust and that exempted from its operation should be stated and given in these instruments as had been verbally agreed upon. About the time these instruments were signed and executed, Brown represented and stated to Pace that they were drawn up and prepared in accordance with the previous understanding and agreement of the parties, and that the lands which should be covered by the deed of trust and should be exempted from its operation, were correctly described as agreed. Pace at the time reposed confidence in the integrity and the honesty of the Browns, and at the time of executing and signing the instruments he believed that the representations so made by them were true and that the land was described according to the previous verbal understanding. He did not examine the instruments critically, in order to see if the lands had been correctly described; but, upon the contrary, the appellees at the time of executing the instruments believed that the land was properly described, as had been previously agreed upon, and if they had known to the contrary, they would not have executed the papers; and in signing the same, the appellee Charles Pace relied upon the truth of the statements and representations made by Brown.

We find that these representations and statements made by Brown, as to the description of the land that should be exempted from the operation of the deed of trust, were not true, and that they operated in deceiving and misleading Pace in executing the instruments. We do not say that these statements and representations were intentionally false, but possibly they were made by Brown under the mistaken belief that the lands had been correctly described, so as to locate the 144 acres, the homestead of appellees, as had been previously agreed upon.

We find that the Browns, in preparing the deed of trust and the homestead designation, did not correctly describe the location of the 144

acres, but by mistake, the location of the 144 acres was described as stated in the deed of trust and in the homestead designation; and that it should have been described substantially as stated in appellees' answer and the judgment of the court.

We also find that the appellees in signing and executing the deed of trust did so under the mistaken belief that Brown had correctly prepared the same, and that the 144 acres were correctly described, as previously agreed upon.

We also find that, about the time that the deed of trust sued upon, of date 1893, was executed, the Browns requested of appellees that they execute this latter instrument, which we find they did execute, and it was executed in lieu of the deed of trust that was executed in 1887. At the time of the execution of the deed of trust of 1893, the appellees had not discovered the mistake in the description in the previous deed of trust or in the homestead designation, nor had they discovered that the representations previously made by Brown were not true; and when they executed the instrument of 1893, Brown represented and stated to Pace that it was prepared in accordance with the previous parol agreement and understanding; and there is evidence which shows that Pace believed these representations, and believed that the instrument of 1893 was substantially as had been previously agreed upon; and that in signing the same, he relied upon the statements of Brown, and if he had known that the statements were not correct, he would not have signed the last deed of trust.

The misdescription of the 144 acres intended to be excepted from the operation of the deed of trust was a material error, in that the land which was actually reserved by the parol understanding was much of it cultivated, and was of greater value than the 144 acres which the deeds of trust by their terms, though mistakenly, reserved to appellees as a part of their homestead. The last deed of trust was also prepared by the Browns or under their direction.

The appellees did not, until the 14th of June, 1896, discover that the representations of the Browns, as before stated, were not true, and that a mistake had been made in the description of the 144 acres, as before stated. The evidence does not show that anything occurred from the time of the execution of the first deed of trust of a nature calculated to excite the inquiry of the appellees into the existence of any mistake or fraud committed in the preparation and execution of the deeds of trust, down to the time that these things were actually discovered. The appellee Pace, in signing the last deed of trust, did not critically examine the same and relied upon the representations of Brown as to its contents and the description given of the land; and he and his wife at the time believed that it correctly described the 144 acres, as had been previously agreed upon; and this last instrument, as well as the former deed of trust, were both executed and signed by the appellees under the mistaken belief that they exempted from the operation of those instruments the 144 acres, as had been previously agreed upon; and there was a mutual

mistake of all the parties to the transaction, in the preparation and execution of the deeds of trust, in creating a lien upon the 144 acres described in appellees' answer and the judgment of the court, which should have been excepted from the operation of those instruments as a part of the homestead of appellees.

Appellee Pace, in effect, testified that R. L. Brown, after the execution of these instruments, admitted that the mistake had been made in the description of the 144 acres, as is claimed by the appellees.

We find that the appellant, some time after the execution of these instruments, took possession of the 144 acres, and that the amount of the verdict and judgment in favor of appellees against appellant for the rent and use of the same is justified by the evidence.

The propositions submitted under appellant's third and fourth assignments of error complain of the refusal of the court to sustain its second and third special exceptions, because it is claimed that from the averments of appellees' answer, the remedy to reform the deed of trust and correct the mistake is barred by the four years statute of limitation, and by laches, and that the action is stale. The second exception raises the question of limitation. The third special exception is as follows:

"And further answering, plaintiff specially excepts to said first amended original answer and cross-petition, and says that same seeks to cancel and reform a written contract on the ground of fraud or mutual mistake; that said pleading alleges that said cause of action or right to cancel and reform said instrument came into being on February 26, 1887, not quite ten years before said pleading was filed, and said cause of action or right first asserted; that it shows upon its face that no confidential relations existed between R. L. Brown and J. Gordon Brown on the one hand and said defendants on the other, and that their interests were adverse to each other, and that they were dealing at arm's length; that it further shows upon its face that the description of the 144 acres in the homestead designation and two deeds of trust, in regard to which the mistake or fraud is alleged, was of the simplest and most easily understood nature possible, and that defendant Charles Pace, three times, and defendant Jessie Pace twice, in the most solemn manner, executed the instruments containing such description, and that, if they did not discover what was contained in the instrument they were signing and acknowledging, it was their own gross, inexcusable negligence that prevented; that said pleading does not show that any artifice to conceal said alleged fraud or mistake was practiced by plaintiff, or that the said homestead designation and deeds of trust and their recorded copies were concealed from said defendants, or that said defendants examined the public records of Travis County, or made any effort to discover the contents of said instruments which they are alleged to have repeatedly signed without knowing what they were; that it is not alleged that defendants, or either of them, were idiots, or weak-minded, or unable to read, or incapacitated from performing the simplest functions of a property holder; that said pleading further shows that said

defendants have been during said time living upon said property, that their means of discovering any mistake was as good and in fact much better than those of plaintiff, and fails utterly to give any excuse for their long delay and negligence, but shows that said attempt to reform said written contract is a stale demand, barred by the laches of said defendants and the four years statute of limitation, and can not be considered or acted upon by a court of equity."

In order to understand the questions raised, it is necessary to state some of the principal averments of the answer. It is there in effect stated, that on the 26th day of February, 1887, appellee Charles Pace executed his note to J. Gordon Brown, for the sum of $1500, and to secure same both appellees executed a deed of trust to R. L. Brown, conveying the land described in appellant's petition; and that, about the same time, Charles Pace executed a homestead designation describing as his homestead the land mentioned in the description given in appellant's petition as excepted and reserved from the operation of the deed of trust. That appellee Jessie Pace did not join with her husband in the homestead designation, and did not know of the description therein given; that such description in the deed of trust and the homestead designation as to the 144 acres which should be reserved to appellees as their homestead, was placed and entered into the deed of trust and the homestead designation by and through the mistake of all the parties to the transaction, or was the result of the fraudulent conduct of the Browns, who prepared these instruments; that there was, before the execution of these papers, a verbal agreement and understanding between the appellee Charles Pace and the Browns, that the deed of trust should only apply to the pasture lands upon the tract of 496 acres described in the instrument, and that the homestead of appellee which should be reserved from the operation of the deed of trust, and which should be described in the homestead designation, should be the 56-acre tract (about which there was no controversy) and 144 acres to be cut off the southeast end of the tract of 496 acres, so as to embrace the land in cultivation then used by Pace and wife as a farm for homestead purposes (this 144 acres is fully described in the answer, which corresponds with the same description given in the judgment of the court); and that the Browns were intrusted with the preparation of the deed of trust and the homestead designation, and that the same were to be prepared in accordance with the agreement as stated; that the Browns prepared or caused to be prepared the deed of trust and homestead designation, which, before the execution thereof, they represented to appellee Pace were in strict accordance with the agreement as stated, and that the land described as reserved by appellees as their homestead was the 56-acre tract and the 144 acres embracing the cultivated land off the southeast end of the 496-acre survey; and that the deed of trust covered the pasture lands and the balance of the 496 acres; that the appellees not knowing or suspecting that these instruments applied to or covered different land than was contemplated and

agreed upon, and believing that they were prepared in accordance with the agreement, and relying upon the representations of the Browns, and believing same to be true, they signed and executed the deed of trust, and Charles Pace signed and executed the homestead designation; that the deed of trust sued on, which was executed February 20, 1893, was prepared by the Browns, and was in renewal of the one previously executed; and that at the time the same was signed and executed by appellees they understood and believed, and the Browns so represented to them, that it covered and described the lands called for in the verbal agreement heretofore stated; and believing such was the case, and relying upon the statements and representations of the Browns, they signed and executed this last deed of trust; that the homestead designation and neither of the deeds of trust correctly described the 144-acre tract which should be reserved to appellees as a part of their homestead; but, on the contrary, the deed of trust covered the cultivated land in the southeast end or corner of the survey, which was a part of appellees' homestead, and which was agreed should not be embraced in the deed of trust as a part of the land subject to the same; and that, instead of the instrument correctly speaking the contract as agreed, it located the 144 acres, which should have been reserved to appellees upon the pasture land; that by reason of the fraud in the nature of the representations and statements of Browns, the appellees were induced to sign these instruments, and they solely relied upon these representations, and they believed they could and did rely upon the good faith and fairness of the Browns in the preparation of the papers; that if they had known that the land which was reserved by the terms of the verbal agreement was not correctly described, they would not have executed these papers; that the mistake is material, which is fully shown by the value given in the answer as the difference between the land described as appellees' homestead and what should have been described; that, for the first time, on the 14th of June, 1896, they discovered that they were deceived as to the description of the land, and up to that time they fully believed that it was correctly described.

The answer then proceeds to set out the facts which led to the discovery, and in effect states that, after that, the Browns admitted that a mistake was made and that the description given did not accord with that verbally agreed upon.

The appellant's cause of action is based upon the deed of trust executed in 1893. The answer of appellees was filed less than four years from the date of that instrument. Where there is no fraud or mistake that would suspend the operation of the statutes of limitation, the four years statute would apply. Considering the question of limitation independent of the elements of fraud and mistake set up in appellees' answer, we do not think that their action to reform was barred. Appellant relied upon the deed of trust of 1893, and the answer attacking that instrument being filed less than four years from its date, was in time.

It is no answer to this view of the question to say that the appellees

could have, prior to that time, instituted a suit to reform the first deed of trust executed in 1887, because upon that instrument no relief is asked by appellant. A failure to urge the action to reform the previous instrument would not operate as a bar for relief against the last deed of trust, when that relief is asked, as in this case, within four years from the date of its execution. It is true, according to the averments of the answer, a mistake was committed and a fraud was perpetrated in the execution of the first deed of trust; but it is also alleged that the same mistake and fraud were committed in the execution of the last deed of trust.

If the facts as pleaded, which constituted the verbal agreement, should have gone into and become a part of the last deed of trust, and the appellant, through its agents, represented that this last instrument was prepared in accordance with the agreement, and such representations were not true, it would be a fraud that would directly affect this instrument, which the appellees could assert when it was sought by appellant to enforce it. But, independent of this view, if the right of reformation was traced back to the time of the execution of the first deed of trust, we do not think that it can be said, as a matter of law, from the averments of the answer, that the action of the appellees to reform is stale or is barred by limitation, either on the ground of fraud or mistake.

In the case of Oldham v. Medearis, 90 Texas, 506, the rule that suspends the operation of the statutes of limitation on the ground of fraud is applied to cases of mistake. Where relief is sought on the ground of fraud or mistake, stale demand and the statutes of limitation do not commence to run until the fraud or mistake is discovered, or until it could have been discovered by the exercise of reasonable diligence.

It is clear from the averments of the answer that there was no actual discovery of the mistake or fraud until a few months before the answer was filed. The answer, in effect, alleges that after the execution of the deeds of trust the appellees had no knowledge of the existence of any mistake or fraud, and it is in effect stated that no grounds of sus- any mistake or fraud, and it is in effect stated that no grounds of suspicion arose after that time that would excite inquiry as to the existence of fraud or mistake. It is also stated that the appellees placed confidence in the Browns, and relied upon the truth of their statements.

If nothing occurred to excite the suspicion of the appellees, and they continued to rely with confidence upon the statements of the Browns that the written instruments correctly embodied the contract, the question then becomes one of fact as to when inquiry should commence to ascertain the existence of a mistake or fraud.

There is no rule of law that prescribes a definite time in which such diligence should be exercised, nor at what particular time in the progress of a contract fraud or mistake should be discovered. These are questions of fact and not of law, to be applied and determined in each particular case, and no general rule has been nor could well be established that would be applicable to all cases where these issues are raised. It would be an anomalous doctrine to assert that where one has been de-

frauded, relying with confidence upon his adversary, he should immediately or within a definite and particular time enter upon a voyage of discovery to ascertain whether a wrong had been perpetrated, where there are no facts or circumstances occurring in the meantime suggestive of any impostion.

In the well considered case of Dawson v. Sparks, 1 Texas Unreported Cases, 762, the Commission of Appeals, upon this subject, say: "What period shall be deemed to be a reasonable time within which a party entitled to rescind shall offer to do so, must depend upon the particular facts and circumstances of the case. Buford v. Brown, 6 B. Mon. (Ky.), 554. Whether Sparks should have been required to use diligence to discover the fraud, would depend on whether, under the circumstances, he had any reasonable grounds to believe that he had been imposed upon by the defendant's representations. If no circumstances of suspicion existed, at the time of the contract or afterwards, until the fraud became known to him, to induce the apprehension of its existence, it is against reason to expect that he should diligently inquire for facts concerning its mere possible existence.

"It was held in Irving v. Thomas, 6 Shepley, 418, that a party can not be justly regarded as confirming a contract believed even to be fraudulent, because he did not repudiate it at an earlier period upon a mere violent presumption of fraud, instead of waiting until he can clearly establish it; and a fortiori, it would seem that a party who has been defrauded by false representations on which he relies, and has no cause to suspect they are untrue, is not to be deemed as having waived the fraud or as confirming the contract, unless, notwithstanding these facts, he shall nevertheless use diligence to ascertain whether fraud had been committed or not. The more consummate the fraud,—the more artful the devices employed to effect a contract whereby the confidence of the defrauded party is secured and induced to enter into it,—so much the less will the injured party be furnished with apparent grounds for distrust; and, therefore, the more justified in not using diligence to discover the reality of the imposition."

Considering the issue of fraud as presented by the answer, we think the rule announced in this case should be applied. It is true, not quite ten years elapsed from the execution of the first deed of trust to the filing of the answer, but it can not be said, as a matter of law, that the appellees could and should, during that interval, have discovered the fraud prior to the time stated in the answer, or that, under the circumstances as pleaded, they should have, during that period, commenced the exercise of diligence to ascertain the existence of facts which they in no wise contemplated existed. Such issues would properly be questions of fact to be passed upon by the jury.

In Campbell v. McFadin, 71 Texas, 32, and Reed v. West, 47 Texas, 248, which were actions in equity to enforce the specific performance of contracts, it is held that what is a reasonable time for performance is a question of fact, which must depend upon the circumstances of each par-

ticular case. The same principle, by analogy, we think should apply here.

The special exception also, in effect, urges the proposition that the appellees were guilty of negligence in not examining and inspecting the deeds of trust before signing the same, and in relying upon the statements and representations of their opponents.

In answer to the first part of this contention, we refer to the case of Chatham v. Jones, 69 Texas, 744, and the recent case of Conn v. Hagan, 93 Texas, 334, where the learned justice of our Supreme Court uses this language: "The defendant in error claims that Mrs. Conn was guilty of negligence in signing the deed of trust without reading it, and that therefore the court ought not to reform the instrument according to her testimony. If the failure to read the instrument was unexplained and there was no reasonable excuse for it, this proposition would be correct, but, when the party is misled by the fraudulent representations of the other party and caused, by confidence in such person and his representations, to sign the instrument without reading it, this does not constitute such negligence as will deprive the maker of the instrument of equitable relief from the consequences of the fraudulent representations."

In Chatham v. Jones, supra, it is held that whether a party was guilty of negligence in signing and executing a paper without reading it, was a question of fact, and not of law.

The case of Railway v. Kisch, L. R. 2 H. L., 120, is an answer to the concluding part of this contention. In the case cited it is stated that, where it is established that a misrepresentation has induced a party to enter into a contract, it is no answer to his claim to be relieved from it to tell him that he might have known the truth by proper inquiry. He has a right to retort upon his objector, that, if he placed confidence in the statement, he can not be charged with a want of caution because he believed it was honestly and truly made. This principle was approved by our Supreme Court in the case of Labbe v. Corbett, 69 Texas, 503. To the same effect are the cases of Roberts v. Plaisted, 63 Me., 335, and Matlock v. Todd, 19 Ind., 135.

It is also contended in the special exception, that as the instruments were recorded, they operated as notice to the appellees of their contents, and that the appellees were guilty of negligence in not inspecting and examining the records of these instruments; for if such had been the case, they could have readily discovered the mistake or fraud.

We think a correct disposition of this question is indicated by what is said in the case of Meade v. Bumm, 32 New York, 278: "It is claimed in behalf of the appellant that the mortgage was duly recorded, and that the plaintiff was therefore chargeable with constructive notice that the statements of the defendant as to its contents were false. No such fact is found by the referee, but if it were otherwise, it is sufficient to say that it is neither the purpose nor the office of the recording acts to charge the immediate parties with constructive notice of the precise contents of the

instrument they execute, but to notify subsequent purchasers and incumbrancers of the rights such instruments are intended to secure." The conclusion is reached that no error was committed in overruling the demurrers.

We will here notice the fact that the questions of limitation, stale demand, and laches, raised by the demurrers just discussed, are not followed up by any assignments complaining of the verdict and judgment on these grounds. Therefore, in further discussing other points involved in the case, we are not required and will not pass upon the evidence so far as the questions of limitation, laches, and stale demand are concerned.

Appellant's fifth, sixth, seventh, and eighth assignments of error complain of the verdict and the judgment of the court on the ground that they are contrary to the evidence and that the evidence is not sufficient to support the same.

The only proposition submitted under these assignments is as follows: "A court of equity will not reform a written instrument on the charge of mutual mistake, where its terms are unambiguous and supported by the testimony of one of the parties thereto; and the only testimony adduced to show mistake is that of the other party to the instrument, it being contradicted by facts and other witnesses, and is vague and uncertain as to the alleged terms of the agreement."

This proposition necessarily calls into review all of the evidence relied upon by the appellees to sustain the verdict and the judgment of the court. The evidence of Mrs. Pace is as follows:

"I am the wife of the defendant Charles Pace. I signed the two deeds of trust, the one in 1887, and the other a renewal of the same, in 1893. When executing said papers, I understood that my husband had designated our homestead, embracing within its boundaries all of the cultivated land on the southeast end of the tract and the 56-acre tract bought from Emmet White, and so understanding, I signed them: I understood that the deed of trust covered only the land west of the creek and that pasture land on the place which was not in cultivation, and that it exempted from its operation all of the cultivated land upon the place which had for years been our homestead. If I had not so understood it, I would not have signed either of said deeds of trust. I talked with my husband about it, and obtained from him this information. I never talked to either of the Brown Bros. about this matter, and never in my life had any communication with them in person or by writing. The deeds were prepared in town and brought out to my house by a notary public, where I signed and acknowledged them. My husband was not present when I signed either of them. No notary public who ever took my acknowledgment to any paper ever explained to me the field notes embraced in the deed of trust and I did not read the same, as I understood they were drawn so as to embrace only the pasture land. My husband, together with myself and our five children, reside upon this 500-acre property, where we have lived for the past fifteen years as our

homestead. The land at the southeast part of the tract known as the old Pace field was where we first resided. We lived there for several years, the cultivated land being around our house there, and after purchasing the White tract we moved our residence on to that 56-acre tract, and the cultivated land on the southeast end of the tract and that part of the same which my husband has put in cultivation since the execution of the mortgage, so used by him for the purpose of raising products for the support of our family, as I understood, has always been our homestead tract. If I had known that any cultivated land was covered by the deeds of trust, I certainly would not have executed either one of same. It was represented to me that it was not. I so understood it, and therefore signed the papers. I never had in my possession, nor did I ever see the written designation of homestead made by my husband. The first intimation I had that it was claimed that this cultivated land was covered by the mortgage was in last June, after the judgment had been taken in this case by the plaintiffs and the land sold under it, when the plaintiffs caused the same to be surveyed and then it was made to appear that the mortgage covered the greater part of the cultivated land and that which my husband had placed in cultivation since the execution of said papers. On discovering this fact, my husband immediately took steps to employ lawyers and obtain a new trial of said case, which was done."

Appellee Charles Pace testified: "I am the defendant in this case. I was born and raised in this county. I am 41 years old. I have lived on the tract of land described in plaintiff's petition for about thirty-five years. I have known R. L. and J. Gordon Brown, I think it will be ten years in February next. I own 496 acres on the James R. Pace tract, including the 56 acres which I bought from Emmet White. All told, there was about 100 acres of these two tracts of land in cultivation in 1887, when these papers were first executed. Eighty acres of the cultivated land was located in the southeast part or corner of the J. R. Pace tract, and 20 acres on the 56-acre tract I bought from White. My old home was in the southeast corner on the J. R. Pace tract, but I was then living on the 56-acre tract. I do not remember just what year I moved there. I lived where the 80 acres were in cultivation quite a number of years. The house in which I lived on the White place was there when I borrowed the money (from Brown Bros.), and there were two houses on the southeast end where the land was in cultivation. These two dwellings were the only ones suitable for renters. In 1887 I claimed the 56-acre tract and the 144 acres on the southeast side (or end) of the J. R. Pace tract as my homestead, which would embrace the farm land, the land in cultivation. The land in cultivation on my homestead was 100 acres; the uncultivated part of my homestead would be in the southeast part of the tract. I borrowed some money from R. L. and J. Gordon Brown and executed a note for it in 1887 to J. Gordon Brown, and a deed of trust to R. L. Brown to secure it on this land. I had negotiations with them about this matter before these papers were

executed; I dealt with R. L. Brown. I think I had these negotiations with him about a week or ten days before the papers were executed; I think I talked to him three or four times about it. The circumstance that caused me to call on Brown Bros. for this loan was: Captain Staniforth, my nearest neighbor, was a personal friend of Brown Bros. and myself also, and when I contemplated borrowing this money I had a talk with Staniforth concerning Brown Bros. and asked him what sort of men they were to deal with, whether honest, upright men, or not, and he told me they were perfectly honorable gentlemen and fair in all their dealings, and that I would be perfectly safe in dealing with them, and on that account I called on R. L. Brown and told him I wanted $1500, and he told me if I could produce a clean title to this property, he would let me have the money. I produced an abstract of title. He investigated it and agreed to make the loan. He wanted a description of the land I wanted to give a deed of trust on. He sat down and wrote out the application for the loan. I signed it. I could not repeat everything in it. (Witness examines said application.) This is the paper; R. L. Brown wrote it. The application does not contain a description of the land. This is the one I signed. I would not say positively that R. L. Brown wrote this, but it seems to me he wrote it himself. They wrote out a designation of homestead for me to sign; I do not think I was present when that was done. Some time elapsed between the time of the application and the time of the designation of homestead, but the designation of homestead was signed by me there in their office. They were to lend me the money and write up a designation of homestead and deed of trust for me to sign. I had nothing to do with the writing or preparation of the designation of homestead or deed of trust; they wrote all papers. I signed it in their office, never took it out of their office, and only had it in my possession in their office long enough to affix my signature. Mr. Brown prepared the deed of trust or had it done; I was not present when it was written. I did not give him the field notes (embodied in said deed); he got them from the abstract of title I furnished him. I pointed out to him what land was to be covered by the field notes, but only verbally. The verbal agreement with Brown Bros. was that I was to give them a deed of trust on all the land lying west of the creek and to reserve 144 acres southeast end of the tract, where the cultivated land was, as my homestead. The north line of this tract was to be of a parallel line with Beckett's 987-vara line, and I reserved also the 56-acre tract. That agreement was understood between all parties to the transaction. When I signed this designation of homestead and the other papers R. L. Brown told me that he had drawn up the papers in accordance with mine and his agreement, and I so understood it. One thing that induced me to sign the designation of homestead was the representation of Staniforth, my friend, as to Mr. Brown's honesty, and in signing it I relied upon Brown's statement that the papers were drawn in accordance with the verbal agreement made with him. I can not say I examined the papers carefully, to see whether

or not his statement was true. I looked at them and saw that the amount of the debt and the rate of interest was all right, and thought the balance was; I was relying solely on Brown in the matter, and with that understanding I signed the papers. The date of the designation of homestead was February 26, 1887; the date of the application for loan was January 31, 1887, and the date of the first deed of trust February 26, 1887. I can not say positively whether the designation of homestead and the deed of trust were signed at the same time or not. These papers I suppose are right (referring to the papers above described.)

"The understanding between Brown Bros. and myself when I executed that deed of trust was that the land covered by it was to be all pasture land; that was distinctly understood between Brown and myself. The way the field notes read in the deed of trust, it covers most of the farm land then in cultivation. It would be guess work to say how much of the farm land I had in cultivation at that time which would be left out by these field notes. I guess the field notes as now written in the deed of trust would cover 80 or 90 acres of the land now cultivated; they would leave very little of the land that was in cultivation when they were executed, except such part as was on the 56 acres. I did not understand when I executed the deed of trust that it covered the cultivated land on the southeast end of the tract; if I had so understood it, I would not have executed it. The cultivated land on the southeast end has been cultivated and used by myself and family for our support for the past twelve or fifteen years; it was my homestead and I relied upon the product of it to support my family. The last deed of trust executed in 1893 was just simply an extension of the first, just a renewal of the first papers; and the understanding between Brown and myself at the time I executed these last papers was that they were to and did cover the same land embraced in the first. In executing them I trusted to Mr. Brown, as at first; we had gotten along nicely, never had any trouble or squabble. When the first deed of trust was executed, R. L. Brown represented to me that he had drawn the deed of trust in compliance with our verbal agreement. I relied on that and signed it. My wife also signed it. The terms of my verbal agreement with him were the same as the terms of the verbal agreement I spoke of before. If I had known when I executed this last deed of trust that it covered the land in cultivation on my place, I would not have executed it. R. L. Brown drew the last deed of trust or had it done. I had it in my possession, of course, long enough to sign it. I do not think I took it out of the office. I think the notary took it out for my wife to sign, to my house, but I was not there when he went out. I never took it out of the office, I signed it there. I never examined the deed records or had anyone to do it for me, from 1887, when I executed these first papers, up to 1893, the time I executed the last papers, to ascertain the land covered by my homestead or the land covered by the deed of trust; I did not

think it was necessary. I never had the written designation of my homestead in my possession except as stated above. The papers were all kept by Brown Bros. in their office and they brought them into court. I never discovered the error in the description of the land covered by the homestead designation and deed of trust until about the 14th of last June, when some of my renters asked me what the surveyors were doing running lines through my farm; that was on a Saturday or Sunday that they told me this, but they told me the surveying had been going on several days; they did not tell me before, because I had not been at home. I never had occasion to look up the matter of the land embraced in these papers until that time. No question or controversy had arisen between Brown and myself on the subject until after a judgment had been rendered against me in this case. I did not file an answer in the case. Mr. Brown told me a party had gotten a small judgment and fixed a lien against this identical land that Brown had the deed of trust on, and he told me he would have to bring suit and foreclose the deed of trust to close out that party's (Richardson's) claim, but that he would dispose of the land to the best advantage and any excess over what my indebtedness was I should have; and I told him that I would waive all service and acknowledge judgment. But they brought suit and the sheriff came out and served a citation on me, and I came in and expressed surprise about it to Brown. I told him I had agreed to waive service of process and myself and wife would acknowledge judgment; and he said a gentleman, Mr. Spear, in the office, did not know it, had ordered issuance of citation, and that was why process was issued. And later on, before the judgment was taken, he wrote me to come in and bring my wife and acknowledge judgment, as we had agreed on. I came in person, but did not acknowledge judgment. We had a talk about the matter before the judgment was taken. I offered no resistance to the judgment. After the judgment was taken and the land sold under it, the sheriff came out to my place, accompanied by Mr. Lynch. I met them on the road and the sheriff asked me if I had any objections to placing Brown in possession of the land that he had the deed of trust on, and which had been sold, and I told him that I had no objections; that was in June, along about the 10th, I think. Mr. Lynch asked me where the land lay and if any of it was in cultivation. I replied that there was not. I told them that the land lay west of the creek; that it was level, ordinary land; that it was not in cultivation. The value of the land on that place in 1887, covered by the deed of trust, and that was in cultivation, was some less than it was in 1893; in 1893 it was worth $30 an acre. The land that I thought I was executing the deed of trust on was worth something like $12 or $15 an acre in 1893, but I could not swear positively to that. There was no land changing hands at that time in our section of the country. I have put in cultivation 60 acres of the land covered by the deed of trust since the execution of the deed of trust; I did not understand that I was putting in cultivation land that was covered by the deed of trust. I thought this land put in was on my

homestead; I put it in cultivation about 1891. If I had known the deed of trust covered that 60 acres, I would not have put it in cultivation.

"As to the conversation which took place between myself and Gordon Brown when Mr. Fitzhugh was present: Mr. Brown dropped me a note to come in and see him,—I think that was in March or April, this year; that the man who owned the mortgage on my land was here and wanted to see me, and see whether or not it would be justifiable to have the land he held the mortgage on put in cultivation. I went up to Brown's office and this gentleman was not there. King was his name, I believe, and Brown had some one in the office to ring him up by telephone, I think down at the Salge Hotel; and while I was there Mr. Fitzhugh came in, and he and Mr. Gordon Brown and I talked about the propriety of putting this land in cultivation; and Mr. Fitzhugh said he did not think it was as good as his Boggy land, and I told him I thought it was. The other party wanted to put the land in cultivation. I never mentioned the matter until they first asked me what means I had of paying off this indebtedness. I told them none, only by selling the land. It was understood they would have to take the land, and they wanted to know whether it would pay to put it in cultivation. Mr. Gordon Brown was the one who spoke of this. Mr. R. L. Brown was not there at that time. I met King on that occasion. They rung him up at the Salge Hotel and he came, and then King and I and Gordon Brown had about the same conversation that we had when Mr. Fitzhugh was there. King concluded that he did not think it would be worth while to spend any more money on the land. Mr. King told me in Gordon Brown's presence that he owned the mortgage. Gordon Brown and King both joined in the conversation; first one and then the other asked questions about putting the land in cultivation. It was well understood by us three there that it was all pasture land which was embraced in the mortgage, and that the cultivated land on the tract was reserved as my homestead.

"The agreement between Brown and myself was that he would draw up a designation of homestead, which would include the 56-acre tract and the land in cultivation at the southeast end of the place, and the mortgage was to cover the rest of the land, which was pasture land not in cultivation. When I signed the papers, he represented to me that he had so drawn the papers as to make the homestead cover the land in cultivation off the southeast part and the 56-acre tract, and so believing I signed the papers, and I never discovered the mistake in this matter until last June, when I took steps to correct it."

Cross examination of Chas. Pace: "I have got in cultivation about 20 acres on the White place, and about 70 or 80 acres (but that is guess work) in the old Pace field; all of this was in cultivation at the time the deed of trust was made; and since the deed of trust I have put in cultivation about 60 acres on west side of the homestead, as I understood it. I never put any land in cultivation on the side west of the

river, because, as I understood it, the deed of trust was on it. The field notes which I intended to cover my homestead would not quite include all the land in cultivation at the time the deed of trust was made, but very near all of it. I thought at the time, and until recently, that all of the land in cultivation was in my homestead."

Witness is asked if it is not a fact that a survey would show to-day that his homestead, as it is set out in the deed of trust, covers about 70 acres of cultivated land, besides the house in which he resided, and answers: "I could not tell exactly, I expect about 70 or 80 acres, but that is guess work. The field notes as they now read cover the house in which I lived in 1887, but I had not been there but a short time; and they cover the barns, stables, cow lots, and the horse lots, and everything as it existed in 1887.

"When I got this money from these people and gave the deed of trust I intended to pay them if I could. When I borrowed the money there was a verbal agreement between myself and R. L. Brown that this deed was not to cover any cultivated land. I did not know then that according to the field notes verbally agreed upon a part of my cultivated land would be covered by the deed of trust. I expect now the deed of trust, as agreed upon, would cover a little of the cultivated land, but it was my intention at the time the deed of trust was executed that it should not cover any of the cultivated land, and was so agreed between us." [Witness examines the application for loan.] "That is my signature to that; that is the written proposition on which I got the money. I said that there were 496 acres in the whole tract—the Nolan tract was not included. I applied for a loan on about 300 acres."

Plaintiffs' counsel reads from said application the following questions and answers: "Land in cultivation? A. 100 acres. Land in mesquite grass and timber? A. 200 acres. Total area? A. 300 acres," and asks the witness what he meant by said answers, and the witness answers: "They asked me the questions how many acres I had in cultivation on the 200-acre tract homestead, and I told them 100 acres."

"Q. Didn't they ask you how the 300-acre tract was, and didn't you say, 100 in cultivation and 200 acres in prairie; total area, 300 acres? A. That might have been inserted in there any time. I can not say whether or not it was in there when I signed it. I can show you that that was undoubtedly a mistake; there was only 100 acres in cultivation on the entire tract of 496 acres, and 80 acres of it was in the old Pace homestead and 20 acres on the 56 acres I bought from White. That statement is not true." [Witness examines the designation of homestead.] "I signed that instrument. I acknowledged it before notary public Shands. I was a justice of the peace of Travis County for four years; I was county commissioner four years and a candidate for re-election at the last election."

"Q. And your contention is that you signed that instrument without knowing what it covered? A. I made the statement to Mr. Brown as to how I wanted to designate those tracts of land, and I relied on him.

I think Mr. Brown did tell me, when I went to him and told him that I had 496 acres, that I would have to designate my homestead before he would make the loan. I do not think he had any information about this land, except what I told him. I do not know that he sent anyone out there to inspect it. Mr. Brown got the field notes from that abstract of title, and I told him how I wanted the land that I was going to give a deed of trust on to lay. I never gave him any data at all." [Plaintiff's counsel reads to witness the field notes in the deed of trust acknowledged the 26th of February, 1887.] "I never gave him any field notes at all. That is my signature to that instrument and that is my wife's; it was acknowledged before notary Shands. It is not a fact that when that deed was drawn R. L. Brown delivered it into my possession and that I put it in my pocket and took it away from his office and did not bring it back until a week or ten days after. It was left in Brown's office. I signed it and Brown got Shands to go to my house for my wife to sign it. I did not acknowledge it in Brown's office when I signed it; I went up to Shands' office after he returned from my house and acknowledged it after my wife did. This instrument does not represent the agreement I had with Brown." [Witness examines deed of trust dated February 28, 1893.] "That is my signature to that instrument; I signed and acknowledged it. That does not express the verbal agreement between Brown and myself. I would like to make this statement: If this land had run up as far on this line as I expected, an ordinary guess would throw those adjoining surveys there about the course that those papers call for, but we had no instrument to set there to show the exact degree at all. There was a great deal more land east of the creek than I thought there was when those papers were drawn. When I executed the designation of homestead, I thought I was setting apart my homestead in a solid block. I would not have done so if I had known it was not in a solid block. I do not know now whether it would lie in a solid body according to what I said was the agreement. My intention was to put it all together. The old Pace field was in cultivation in 1887 at the time I executed this lien."

On redirect the witness testified: "The controlling idea in designating my homestead was to embrace all the cultivated land. There was a great deal more land than I thought there was east of the creek. I thought the 144 acres would run up on the east line of the 56 acres and throw my land all in a body, but it did not do it. I told Brown the deed of trust should cover all the land lying west of the creek, and the remaining balance between this line and the 56-acre tract and Beckett's tract; that is this land here [pointing it out on the map]. The quantity of land he was to have a deed of trust on was 300 acres, more or less.

"Q. If you cut off 144 acres in the southeast end embracing the cultivated land in the southeast side or corner, then it is bounded as the field notes you have given in your answer as your homestead are bounded, that is, by the Pace tract on the west side, and the original

south line of the Jas. R. Pace tract on the south side, and by the Nolan tract and the 60-acre Stanley tract on the east, and on the north by a line running parallel with the south line of this tract and also parallel with Beckett's south line, which is 987 varas long? A. Yes, sir; that would be about it. The agreement was that my homestead was to be on the southeast side; these adjoining tracts, as I thought at the time [referring to the plat] would just about tally with how the field notes should have read.

"It was agreed between Brown and myself that the designation of my homestead should cover the cultivated land in the S. E. side and corner, and that the deed of trust should exempt all cultivated land as homestead; he was to draw the papers. He did so, and represented to me that they were drawn in accordance with the agreement. I believed this to be true, and relying upon this statement, I signed the designation of homestead and the deed of trust, without reading the field notes in either to verify his statement, and I never discovered the mistake in description until after they sold the land under their judgment and had it surveyed out last June, when I applied for and obtained a new trial. I employed lawyers to obtain a new trial, as soon as I learned of the mistake."

Re-cross-examination: "When this loan was made, I had under fence by itself the 56 acres marked Charles Pace on the map, and purchased by me from White; I also had a fence around the 'old Pace field' tract in the south corner and all the rest of the land was pasture, with no cross fences or subdivisions and was used all alike to pasture my own cattle and horses on, and sometimes to pasture other cattle and horses on at so much per head per month.

"My fence lies near the line agreed upon between me and Nolan on the tract of land spoken of in my pleadings as the tract I intended to designate as my homestead and adjoining the Nolan tract—practically on the line; my fence is right on my cultivated land; it takes in part of the Nolan tract in my field, an acre or two. That fence has been there ten years. There are no field notes as to the Noland tract. Mr. Nolan has no field notes of this land; he claims my father sold him part of it, but I admit that my father did sell it to him and he paid for it, and we have agreed on the line between us.

"I have heard the testimony of R. L. Brown in regard to what occurred between us during our communications and negotiations. After this mistake was discovered by me [referring to alleged mistake in the field notes in the deed of trust] I came in to see R. L. Brown about it, and told him of it, and he told me that he did not know anything about it, but if a mistake was made he would investigate the matter and it would be corrected; so I let the matter rest, I think a couple of days, and during that time Brown Bros. sent one of their men out there and got my renters to sign an application to Brown Bros. to turn over the land to them. I came to see Brown a second time and told him of the mistake, and he said, 'I understand all that, but I have

to be governed by the way the field notes read; I am not going to make corrections.' The remark, 'I understand all that,' was called forth by what I told him about the mistake that had been made. And I told him, 'You understand how this deed was to be drawn up, that it was not to include any farm land.' He said, 'I understand all that, but I have to be governed by the field notes.' He said he would not correct it (the mistake).

"Now, in regard to his testimony about those papers being taken out of his office by me; there was not a single one of those papers ever left Brown's office by me; I signed every paper right in Brown's office. I think he stated I took them out with me; that is a mistake. I signed the deed and left it there, and he got Mr. Shands to go out and take my wife's acknowledgment, and when Shands returned, I went down to Shands' office and acknowledged to my signature.

"Gordon Brown stated in his testimony that no such conversation had taken place between Mr. Fitzhugh and I and Mr. King and I in his presence (about putting the land in cultivation). Gordon Brown is the very man who told me that 'King is here and wanted to discuss the propriety of putting the land in cultivation and wanted to see me;' and when I went in, King was not in the office and he had one of his men ring up King at Salge's Hotel and to tell him I was there and to come right up. In the meantime, Mr. Fitzhugh came in, and Gordon Brown, Fitzhugh, and myself discussed the matter, and Mr. Fitzhugh told me that himself and King were out on the land the evening before, and he (Fitzhugh) did not think that the land was as good as his Boggy land. I told him I thought it was. That conversation did take place between King, Gordon Brown, and myself, as detailed this morning.

"At the time of that conversation between myself and King and Gordon Brown, this deed of trust had not been foreclosed. I was entitled to possession of the land until foreclosure. Mr. King asked me the direct question, how I proposed to settle off this indebtedness? I told him the only way was to sell or dispose of the land, and that is the way this question was discussed. King did not have a right to put it in cultivation, but I intimated to him that he would have to take the land. He did not make any agreement to take the land off my hands. I was at that time the only one who had the right to put it in cultivation. When I borrowed this money from Brown Bros. I intended to pay it back. I did not intend to borrow the money and dump the land on him. I borrowed the money for five years.

"Q. Why, if you intended to pay it back and had five years in which to do it, were you unwilling to put in cultivation any part of the land that had a trust deed on it? A. I thought if I put the land in cultivation that I did put in cultivation, in five years 1 could make the money off the land. I did state that I would not put in cultivation any part of the land that I thought was covered by the deed of trust; I would not do it because that, in case I failed in anything, I did not

propose to rob my wife and children. Q. You abstained from cultivating any of it you thought was covered by a deed of trust, because you feared you might not be able to pay the debt? A. . Of course."

The effect of the evidence of the witness R. L. Brown, who testified in behalf of appellant, is that no mistake was made in the description of the land contained in the deed of trust, nor were the representations made, as shown by the evidence of witness Pace; but the jury had the right to consider, as appears from the facts elicited upon the cross-examination of this witness, that the effect and force of his positive denial of a mistake and the existence of representations was much impaired.

In cases of this character, where the purpose is to reform a written instrument, no greater amount or certainty in the evidence is required than in cases where the purpose is to be relieved from the legal effect of a written instrument on the ground of fraud or mistake; or where the object is to engraft upon the legal title a trust, or to convert a deed absolute in form into a mortgage. Upon principle, no distinction can be made in this class of cases from the one before us.

Chancellor Kent, in the leading case of Gillespie v. Moon, 2 Johnson's Chancery, 585 (7 American Decisions, 566), which is so often referred to as authority upon the proposition that parol evidence is admissible to reform a written instrument and to relieve against mistake, says: "It is the settled law of this court, as was shown in the case of Boyd v. McLean, 1 Johnson's Chancery, 582, that resulting trusts may be established by parol proof in opposition to the deed and in opposition to the answer denying the trust. There is no reason why the answer should have greater effect in this than in that case; and there would be manifest inconsistency in the doctrines of the court if such a distinction existed."

In these classes of cases, the rule announced is that the evidence should be clear and satisfactory; and among those where the purpose was to establish a trust or create a mortgage may be mentioned the following: Wallace v. Berry, 83 Texas, 330; Prather v. Wilkens, 68 Texas, 190; Neyland v. Bendy, 69 Texas, 713; Baylor v. Hopf, 81 Texas, 641; Johnson v. Deloney, 35 Texas, 47; Pierce v. Fort, 60 Texas, 471, and Howard v. Zimpelman, 14 S. W. Rep., 60. In the latter case the authorities were reviewed by the present Chief Justice of the Supreme Court, and the conclusion practically reached as just stated.

Among the many instances where fraud was alleged as the ground of relief from the legal effect of written instruments, may be mentioned the following cases: Sparks v. Dawson, 47 Texas, 144; Rider v. Hunt, 6 Texas Civ. App., 241; Rohrbough v. Leopold, 68 Texas, 260; Wylie v. Posey, 71 Texas, 39; Baines v. Ullmann, 71 Texas, 536; Bluntzer v. Dewees, 79 Texas, 275; Schmick v. Noel, 72 Texas, 4; Burch v. Smith, 15 Texas, 219; Layton v. Hall, 25 Texas, 210.

Reasoning by analogy from the rule established in these cases, if

the testimony is clear and satisfactory that a mistake was committed, the written instrument ought to be reformed so as to express the real intention of the parties. As in effect stated in some of the cases cited, and which was held in the previous appeal of this case (which will be found reported in 43 Southwestern Reporter, 36), this does not mean that the mistake should be established beyond a reasonable doubt, and such a test as to certainty of proof is not required in cases of this class, or any other of a civil nature known to our practice.

The expression "clear and satisfactory," in the sense in which it is here used, we think should be taken to mean that it should be clear in the sense that the evidence upon which reformation is based is not ambiguous, equivocal, or contradictory, and should be perspicuous and pointed to the issue under investigation, and satisfactory in the sense that the source from which it comes is of such a credible nature that the court and jury, as men of ordinary intelligence, discretion, and caution, may repose confidence in it.

In Leitensdorfer v. Delphy, 15 Missouri, 119, it is said: "It is not necessary in order to establish a mistake in the instrument that it shall be shown that particular words were agreed upon by the parties as words to be inserted in the instrument. It is sufficient that the parties agreed to accomplish a particular object by the instrument to be executed, and that the instrument as executed is insufficient to effect their intention. Although it is said that the evidence required to prove a mistake, when it is denied, must be as satisfactory as if the mistake were admitted, yet this and similar remarks of the judges, however distinguished, form no rule of law to direct courts in dispensing justice. When the mind of a judge is entirely convinced upon any disputed question, whether of law or of fact, he is bound to act upon the conviction."

The court in the case of Showman v. Miller, 6 Maryland, 485, in discussing the case of Gillespie v. Moon, supra, say: "That the learned chancellor, whilst he held that all the cases required evidence to be full and strict, adduced from them the practical rule that, if the mind of the court be satisfied, then the requisition is complied with." This was an action to correct mistake in a deed.

In the case of Stines v. Hays, 36 New Jersey Equity, 369, where the action was to reform a deed on the ground of mistake, the court say: "Nor will the fact that the defendant denies that there is a mistake, and testifies that the deed was drawn according to the intention of the parties, prevent the court from granting the relief, if it is satisfied that the deed is not in accordance with the agreement, but ought to be so."

The evidence of Pace, if he is to be believed, is sufficiently clear and definite upon the point that a mistake was committed, and it is sufficient to establish the fact that the mistake was mutual, although it was denied by Brown; and, notwithstanding this denial, the quality of mutuality can be established by the conclusions and deductions to be drawn from

the evidence. In fact there is explicit evidence upon this question, wherein Pace testifies that Brown, in effect, admitted that a mistake was committed. And it is here well to say that the evidence in the record, of Brown's denial of this admission, is not of a most satisfactory nature. Pace testified explicitly that the understanding was that the 144 acres was to embrace his cultivated lands out of the southeast end of the tract.

Under the test given, as before stated, the question is whether his evidence was satisfactory, or, in other words, whether he was worthy of belief. The determination of this question was solely the province of the jury. Where his evidence was explicit and to the point, showing that a mistake had been made, the weight to be given such evidence was a question for the jury. They had the right to believe him or disbelieve him, and having believed him, it is clear that for the purposes of this case, the testimony furnished by him was from a credible source.

In the case of Trout v. Goodman, 7 Georgia, 385, where the court expressed doubt as to the quantum of evidence sufficient to correct a mistake, it nevertheless affirmed the conclusion reached by the jury, upon the ground that they were the judges of the credibility of the witnesses and the weight of the testimony, which is in keeping with the statutes of this State upon that subject. The court there stated: "We do not feel at liberty to set aside their verdict as contrary to evidence. The weight of the testimony was their business, not ours." And in that case, the fact of mistake was denied; and the same court, in the subsequent case of Wall v. Arrington, 13 Georgia, 92, reviewing the case just noticed, reiterates the doctrine that as the evidence was competent, its weight and credibility was to be determined by the jury.

The most satisfactory discussion of this subject that we have been able to find is by the court in Linn v. Wright, 18 Texas, 337, where an attack was made upon a deed of assignment on the ground of fraud; and we think, by analogy, the rule there stated ought to apply to cases of this character. In discussing the question how far the evidence should go in establishing fraud, or what presumptions will be indulged in in aid of the legality of the instrument, the court say: "To warrant the jury in so finding, it was not necessary that the circumstances tending to that conclusion should have been incapable of being accounted for upon any other hypothesis. There is no such rule of evidence or principle of law as that, in order to authorize a jury to deduce from circumstantial evidence the conclusion of fraud, the circumstances must be of such a conclusive nature and tendency as to exclude every other hypothesis than the one sought to be established. If the evidence is admissible as conducing in any degree to the proof of the fact, the only legal test applicable to it upon such an issue is its sufficiency to satisfy the minds and consciences of the jury. The question of fraudulent intent is a question of fact which it is peculiarly within the province of the jury to decide. They are the exclusive judges of the weight of evidence and are to be guided in their decision by

their conscientious judgment and belief, under all the circumstances of the case. 1 Stark. on Ev., 474; 1 Texas, 326. What amount or weight of evidence shall be sufficient proof of such intent can never be matter of legal definition. The law, therefore, refers the weight of evidence and the degree of probability to the jury, and the only test which can be applied is its sufficiency to produce a satisfactory conviction or belief in their minds."

If Pace is to be believed, it is clear that the deed of trust executed by the parties did not accomplish one of the particular objects agreed upon. His evidence defining and stating what was its object is, in our opinion, sufficiently definite. It goes into the details concerning the transaction between the parties, and is practically to the effect that the agreement was that the 144 acres should be taken out of the southeast end of his 496-acre tract, so as to embrace his cultivated and improved lands. This the instrument failed to do, and the jury, believing Pace, were authorized in reaching the conclusion that it should be reformed.

If we recognize the principle that the jury have the right, and it is their duty to pass upon the credibility of the witnesses who furnish the evidence, it logically follows that in their election between which of two conflicting statements are true, the adoption of one necessarily leads to the exclusion of the other as unworthy of belief. Consequently, in determining the weight that should be given to the evidence of the witness Pace, the contradiction of the witness Brown is entitled to slight consideration, for the conclusion must be reached, as the jury has selected the evidence of Pace as worthy of belief, in considering its weight and credibility it must stand as if never contradicted.

In the action of Knapp v. White, 23 Connecticut, 543, which was one to correct a mistake in a deed to land, it is, in effect, said that consistent with the facts we may always draw inferences from our observation of the usual habits of men, which may lead to a great variety of presumptions. These inferences are the conclusions drawn by reason of common sense from premises established by proof, and are as applicable to questions of intention, where the intention of the parties becomes important, as to any other disputable fact. And, continuing on the question as to the power of a court to reform, the opinion says: "But this does not mean that there must always exist direct and positive proof that the instrument does not express the true intent of the parties in order to justify the court in reforming it. To give any such construction to the rule would be to deny any right in a court of equity to interfere," etc.

In acknowledging this wholesome rule, there are some very important circumstances connected with this transaction tending to corroborate the evidence of the appellees on the issue of mistake. It is clear from the evidence that, at the time that the first deed of trust was executed, the appellees had in cultivation and used in connection with their rural homestead, for their maintenance and support, about 100 acres; about 20 acres of this, according to the evidence of Pace, was on the 56-acre

tract not in controversy, and the balance was in the southeast part of the 496-acre tract. This was all that he had in cultivation at that time. He was cultivating, using and enjoying the same as a part of his actual homestead. The Browns in their evidence display some legal knowledge of and familiarity with the homestead laws of this State; and it is not presumed that either they or Pace were ignorant of the provisions of our Constitution and laws bearing upon that subject and the interpretation that had been given to them by the reported decisions of the courts of this State. The deed of trust, as drawn by the Browns, did actually cover nearly all of the cultivated lands then used by the appellees. If such an incumbrance was of the character (and which is clearly the case) that was at that time and is now denounced by the Constitution and the decisions thereunder as absolutely void, then, as said in the case of Knapp v. White, supra, we can indulge in inference that taking security upon such property is opposed to reason and common sense.

Then, on the other hand, it is opposed to reason to assume that Pace, a small farmer, would incumber his actual homestead; and, so it may be assumed that neither party intending to defraud the other or to create a lien which would be absolutely worthless, would deliberately execute an instrument that could not be enforced against much of the property described in it.

Pace's homestead designation, upon its face, purports to be executed under those provisions of the statute that authorize the head of the family to designate, out of a larger tract, the homestead that he intends to use and occupy. We do not understand this provision of the statute to mean that the husband, without the joinder of the wife, can deliberately abandon the homestead in actual use and enjoyment and cultivation,—that portion of the property used in connection with the home,—and locate it elsewhere on the tract on unimproved and uncultivated land.

In the case of Texas Land Company v. Blalock, 76 Texas, 89, it is held that if there is an actual use and enjoyment of the property in connection with the home for the support and maintenance of the family, it is impressed with the homestead character and exemption, which can not be defeated by either oral or written statements and declarations of the husband to the contrary. Now the designation made by Pace, while it purports to be under the statute, was really executed and intended as a part of the transaction leading up to the execution of the deeds of trust. It could serve no better purpose than a statement of Pace which is denounced in the Blalock case. The physical fact of use impressed all of the 100 acres in cultivation with the homestead character, and the written statement of Pace to the contrary, made under the circumstances, was worthless.

But, however, if the designation could be considered as made under the statute, as we read the recent case of Affleck v. Wangermann, 93 Texas, 351 (55 Southwestern Reporter, 313), the want of the power

of the husband to renounce the actual homestead is put at rest. The syllabus of the case correctly states what is decided, and it is as follows: "Revised Statutes, article 2403, provide that where the homestead of a family not being in a town or city, is a part of a larger tract than is exempt from forced sale as such homestead, the head of the family may designate and set apart the homestead not exceeding 200 acres, to which the family is entitled; held, that the head of a family could not by his designation renounce a part of his actual homestead and claim a tract wholly disconnected therefrom and not used for homestead purposes. And hence a mortgage by him of the part sought to be renounced was invalid, notwithstanding the designation of the remote part was of record at the time of the execution of the mortgage."

The case turns really upon the proposition that while the statute authorized the husband to designate the homestead, he can not renounce that part in actual use and cultivation as a part of the home, and place the homestead upon uncultivated lands, for the purpose of creating a lien on the lands in actual use.

It was contended in argument that an instrument could only be reformed upon the testimony of two witnesses, or of one with strong corroborating circumstances. There are cases in this State (Cuney v. Dupree, 21 Texas, 219, and Grace v. Hanks, 57 Texas, 15,) which have recently been followed by this court in the case of Muckelroy v. House, 52 Southwestern Reporter, 1039, to the effect that a parol trust can not be engrafted upon the legal title by the evidence of one witness testifying to the declarations of the deceased trustee. The reason for the rule, which we approve, is stated in the case of Grace v. Hanks, but this case is not governed by that rule. Pace testifies as to transactions of which he possessed a personal knowledge, and at a time when his adversaries are alive; and the case of Grace v. Hanks is really one which illustrates the proposition that the evidence of one witness is sufficient to impress upon the legal title the trust estate. While the court in that case held that the evidence of the witness Hopper, depending alone upon the declarations of Woolfork, was not sufficient to establish the trust, his testimony, based upon facts within his knowledge, was sufficient.

In the case of Pierce v. Fort, 60 Texas, 471, the trial court instructed the jury that a deed absolute in form could not be converted into a mortgage, unless the fact was established by at least two witnesses, or by one with strong corroborating circumstances. The court held this charge erroneous and said that the technical rule was applicable only to cases where it was sought to establish the trust by proving the declarations of a deceased trustee, or where the trustee was testifying to the trust in his own interest.

In the case of Layton v. Hall, 25 Texas, 211, the court holds that it is not necessary that fraud should be established by two witnesses,

and overrules to the contrary the previous opinion rendered in the same case in 16 Texas, 279.

The two witness rule, or the one with corroborating circumstances, which prevails in some of the States in cases of this and like character, does not exist in this State, except in cases where the evidence is of the character mentioned in the case of Muckelroy v. House, supra. Such a rule, we think, has no foundation in principle; for if the evidence is of such a character, whether it comes from one or many witnesses, as to satisfy the conscience of the court that its equitable relief should be administered, no hesitancy should be felt in applying the principles that would govern the particular case.

It would be a singular proposition to announce that the law more sacredly guards and protects the property of the citizen than it does his life or liberty; yet an admission of the insistance of appellant would necessarily lead to the conclusion that life or liberty could be lost on less evidence than would be required to deprive him of an apparent right in property. It is true that, in criminal prosecutions, in order to convict, guilt must be established beyond a reasonable doubt; but in nearly all of the offenses denounced by our law, with a few exceptions, the accused may be convicted upon the uncorroborated evidence of a single credible witness. The forfeit of liberty, and even life, may rest upon the evidence of one witness; then why, may it be asked, in the absence of legislation declaring otherwise, should the rights of property rest upon a more secure basis?

If in an action seeking to hold one liable to the apparent legal effect of an instrument, the defense of forgery is interposed, escape from liability may be based solely upon the evidence of the party sought to be charged, although the false signature may most accurately resemble the genuine; and even in such a case, a conviction for felony may rest solely upon the evidence of the injured party.

The distinction that is sought to be made by appellant in cases of the class before us, which burden relief with a greater amount of proof than is required in the cases cited and the possible instances discussed, is unfounded in principle and should not prevail. Therefore, the conclusion reached upon the evidence as stated is, that it is sufficient to support the verdict and judgment on the issue of mistake.

Under appellant's first and second assignments of error is submitted this proposition: "It was necessary for defendant, in order to secure a reformation of the deed of trust, to set out with accuracy the particulars in which the deed of trust failed to express the agreement of the parties, to identify the 144 acres of the homestead sought to be excepted from the terms of the instrument, and to identify the land which the reformed deed of trust would embrace."

We think that the description given in appellees' answer, as well as their evidence, is sufficient to identify the land in controversy and that covered by the deed of trust, and authorizes the judgment of the court describing the 144 acres where located. In fact the description

of the 144 acres in controversy is about as definite and accurate as the description given in appellant's deed of trust of the 144 acres there stated which should be excepted from the operation of that instrument, for, in the boundaries of the 144 acres described in that instrument, it calls for a parallel line with the Beckett line and calls to be bound by surrounding surveys. The 144 acres described in appellees' answer and the judgment of the court which was intended should be excepted from the operation of the deed of trust, is bounded on the west by the D. C. Pace 105-acre tract; on the south by the original south line of the James R. Pace survey; on the east by the Nolan tract and the 60-acre tract of Stanley, and on the north by a line running parallel with the south line of this tract, at a sufficient distance north of said south line to give 144 acres; which north line of this tract is also parallel with the 987-vara line on the south of Beckett's tract, mentioned in the deed of trust.

Only such a description is required as will enable one to find and ascertain the location of the land called for. Douthit v. Robinson, 55 Texas, 73. One who may be familiar with the location of the lines called for would have no difficulty in finding and identifying the lands described; and as most conclusive evidence of this fact, the surveyor Wallace, a witness for the appellant, as shown by his evidence and the map prepared by him, had no difficulty in locating and identifying the lands described in the field notes as given by appellees.

The deed of trust as corrected, with this 144 acres excepted from its operation, together with the 56-acre tract, which is also admitted was reserved, would cover and embrace all of the 496 acres owned by Pace; and the judgment of the court, as we read it, reforms that instrument and forecloses the lien upon all of the land except that described in appellees' answer. We clearly think that the description given in the answer was sufficient.

We are also of the opinion that the evidence, with reasonable certainty, identifies the 144 acres which should be excepted from the operation of the deed of trust. The testimony bearing upon that question is as follows: Pace testified that he owned 496 acres on the James R. Pace tract, including the 56 acres which he bought from White. All told, there was about 100 acres of these two tracts in cultivation at the time the first deed of trust was executed. Eighty acres of this cultivated land was in the southeast part or corner of the James R. Pace tract, and 20 acres on the 56-acre tract bought from White. His old home was in the southeast corner of the James R. Pace tract, but at that time he was living on the 56-acre tract. The land cultivated on his entire homestead was 100 acres, and the uncultivated part of his homestead was in the southeast part of the 496-acre tract. "Mr. Brown prepared the deed of trust or had it done. I was not present when it was written. I did not give him the field notes. He got them from the abstract of title furnished him. I pointed out to him the land that was to be covered by the field notes, but only verbally,

and this agreement with Brown was that I was to give them a deed of trust on all the land lying west of the creek and to reserve 144 acres— southeast end of the tract, where the cultivated land was—as my homestead. The north line of this tract was to be of a parallel line with Beckett's 987-vara line, and I reserved also the 56-acre tract. This agreement was understood between all the parties to the transaction. The understanding between Brown Bros. and myself when I executed the deed of trust was that the land covered by it was to be all pasture land. That was distinctly understood between Brown and myself. The way the field notes read in the deed of trust, it covers most of the farm land then in cultivation. It would be guesswork to say how much of the farm land I had in cultivation at that time which would be left out by these field notes. I guess the field notes, as now written in the deed of trust, would cover 80 or 90 acres of the land now cultivated. They would leave very little of the land that was in cultivation when they were executed, except such part as was on the 56 acres. It was well understood by us that it was all pasture land which was to be embraced in the mortgage; and that the cultivated land on the tract was reserved as my homestead. The agreement between Brown and myself was that he would draw up a designation of homestead which would include the 56-acre tract and the land in cultivation on the southeast end of the place, and the mortgage was to cover the rest of the land, which was pasture land, not in cultivation. When I borrowed the money there was a verbal agreement between myself and R. L. Brown that this deed was not to cover any cultivated land. I did not know then that according to the field notes verbally agreed upon any part of my cultivated land would be covered by the deed of trust. I said that there were 496 acres in the whole tract. The Nolan tract was not included. I applied for a loan on about 300 acres."

This question was asked the witness: "If you cut off 144 acres in the southeast end, embracing the cultivated land in the southeast side or corner, then is it bounded as the field notes you have given in your answer as your homestead are bounded, that is, by the Pace tract on the west and the original south line of the James R. Pace tract on the south side, and by the Nolan tract and the 60-acre Stanley tract on the east, and on the north by a line running parallel with the south line of this tract, and also parallel with Beckett's line, which is 987 varas long?" The answer is: "Yes, sir, that would be about it. The agreement was that my homestead would be on the southeast side. These adjoining tracts, as I thought at the time [referring to the plat] would just about tally with how the field notes should have read. It was agreed between Brown and myself that the designation of my homestead should cover the cultivated land in the southeast side and corner, and that the deed of trust should exempt all cultivated land as homestead. He was to draw the papers. He did so, and represented to me that they were drawn in accordance with the agreement."

Just before this he testified that "the controlling idea in designating

my homestead was to embrace all the cultivated land. There was a great deal more land than I thought there was east of the creek. I thought the 144 acres would run up to the east line of the 56 acres, and throw my land all in a body, but it did not do it. I told Brown the deed of trust should cover all the land lying west of the creek and the remaining balance between this line and the 56-acre tract and Beckett's tract; that is this land here [pointing it out on the map]. When this loan was made, I had under fence by itself the 56-acre tract, marked 'Charles Pace' on the map and purchased by me from White. I also had a fence around the old Pace tract in the southeast corner, and all the rest of the land was pasture with no cross fences or subdivisions. My fence lies near the line agreed upon between me and Nolan on the tract of land spoken of in my pleadings as the tract I intended to designate as my homestead and adjoining the Nolan tract,— practically on the line. My fence is on the cultivated land. It takes in a part of the Nolan tract in my field, an acre or two. There are no field notes to the Nolan tract. Mr. Nolan has no field notes of this land. He claims my father sold him part of it, and I admit that my father did sell it to him and he paid for it, and we have agreed on the line between us."

The above is the evidence of appellee Pace concerning the location and description of the 144 acres.

Surveyor Wallace, a witness for the plaintiff, testified that he had been a practical surveyor for over twenty years, and was familiar with the Pace land and its lines. That he made the sketch and plat heretofore set out in this opinion. He testified that if the 144 acres was laid off out of the southeast corner of the tract, in accordance with the field notes claimed by defendants in their answer, its position would depend on what was meant by the Nolan tract. That if it was laid off on the ground out of the southeast end of the tract covered by the field notes of the deed of trust, including the land marked "Nolan tract," its north line would be represented by the green line, as shown on the map. That if it was laid off out of the southeast end, exclusive of the Nolan tract, its north line would be represented by the black line shown on the map.

The description given in the answer and the judgment of the court extends the 144 acres up to this black line, as testified to by Wallace. As previously stated, Pace testifies that no part of the Nolan tract was to be embraced in the deed of trust. In other words, such is the construction we place upon his evidence on this point. It is clear from this evidence that the purpose and intention was that the 144 acres that should be reserved as a part of the homestead of appellees, should be taken out of the southeast end or side of the 496 acres owned by Pace, so as to embrace and include his cultivated lands. The question asked Pace, as above stated, embraces practically the same description given in appellees' answer and the judgment of the court; and it is clearly in-

dicated by his answer to the question and all of his testimony concerning the description, that this was the land pointed out by him, which should be reserved from the operation of the deed of trust, and that it was the intention that this land should be set apart as his homestead. As evidence of the fact that the description given by him was sufficient to identify the land, the witness Wallace had no difficulty in determining its location and accurately pointing it out to the court from the data given by Pace, and the description furnished by his testimony, which is practically the same as that stated in the answer.

It is evident that the purpose was that the 144 acres was to be taken out of the southeast side or corner of the 496-acre tract, not including the Nolan, and extending north from the south line of the James R. Pace. The lines of the Nolan, it seems, are agreed upon; and it seems that Surveyor Wallace had no difficulty in identifying them, as they are plainly stated and delineated by him upon the map. This Nolan tract, it seems, lies in the southeast corner of the James R. Pace survey. The southeast end or corner of the 496-acre tract would lie along and adjacent to the west and north line of the Nolan, as shown on the map.

It is clear from the facts that the 144 acres was not to embrace any part of the D. C. Pace 105-acre survey, as shown on the map. And it is clear that if the intention was to locate the 144 acres in the southeast end or corner of the 496 acres, that it should extend north from the south line of this survey such a distance as to give the number of acres called for. If we were to commence at the southeast corner of the 496-acre tract on the south line of the Pace where it connects with the Nolan, then run north and east with the line of the Nolan as stated on the map; thence north with the west line of the Stanley, and then return to the beginning point and run west from the southeast corner of the 496-acre tract where the Nolan joins the Pace, west to the D. C. Pace line, thence north to the black line, as shown on the map, the 144 acres could and would be located in the southeast end and corner of the 496-acre tract, extending north according to the evidence of witness Wallace, as far as the 1618 2/5-vara black line, as shown on the map, which would be parallel with Beckett's line, as called for in the deed of trust.

In Day v. Needham, 22 Southwestern Reporter, 103, where the description given was "less 60 acres out of the southwest corner of the survey," it was held that the 60 acres should be taken out of this corner, with the beginning point at the corner.

In the case of Smith v. Nelson, 19 Southwestern Reporter, 734, where the description was "one acre, being the southeast corner of the northwest one-fourth," giving the number of the section, contained in a sheriff's deed, without further description, it was held that the description was sufficient, and a line should be run in a square form, commencing from the southeast corner called for. The court in the opinion says: "The defendant insists that the sheriff's deed is void for un-

certainty in the description of the land which it undertakes to convey. It was held in Wilkinson v. Roper, 74 Alabama, 140, that a description of ten acres of land off the northwest corner· of a named subdivision was sufficient and not void for uncertainty. Says the court: 'It calls for a quadrangle of equal sides, extending to the northwest corner.' That was a conveyance between parties and not a sheriff's deed. In Lessee of Walsh v. Ringer, 2 Ohio, 328, the sheriff levied upon and sold the land as 'seventy acres, it being and lying in the southwest corner of the southwest quarter of section 14, township 12, range 5, of the lands sold to Steubenville.' In disposing of the objection that the description was vague and uncertain, the court said: 'That corner is a base point, from which two sides of the̍ land conveyed shall extend in equal distance, so as to include by parallel lines the quantity conveyed. From this point, the section lines extend north and east, so as to fix the boundary west and south. The east and north boundaries only are to be established by construction, and the rule referred to gives them with sufficient certainty.' Lego v. Medley, 48 Northwestern Reporter, 375, concedes that 'one acre from the southeast corner' of a named subdivision would mean an acre in a square form; but in that case the words were added, 'together with the buildings thereon,' and it was held the acre should be laid off so as to include the buildings. It is very true that an acre of land may be laid off in the corner of a 40-acre tract in various shapes, and still be in the corner in a certain sense; but the words 'one acre, being the southeast corner' of said 40 acres, without further descriptive words, mean an acre in a square form. This would be our conclusion in the absence of any authority to the contrary; but it is strengthened by the cases just cited, which are quite in point.˙ The description is, therefore, sufficiently definite and certain."

We think, by analogy, the rule admitted in these cases applies here. By reason of the configuration of the adjoining surveys, that is, the Nolan and the D. C. Pace, as shown on the map, the 144 acres can not be taken in a square form, commencing from the southeast end or corner; but when we give effect to the evidence of quantity, which clearly in this case shows that the intention was to reserve 144 acres, wherever located, and pay due regard to the call for quantity, in connection with the call for the southeast end or corner of the 496-acre tract, it is clear that, beginning at this last point, which should be the beginning place, as admitted in the decisions quoted, the distance north should be run with the lines of the surveys adjoining, so as to include 144 acres, which, according to the evidence of witness Wallace, would extend it to the black line as shown on the map, as before stated.˙

We are clearly of the opinion that the evidence of description and identity is sufficient to warrant the judgment of the court. The description given is really more accurate than that held sufficient in Kingston v. Pickins, 46 Texas, 99; Wilson v. Smith, 50 Texas, 367; Douthit v. Robinson, 55 Texas, 73, and Giddings v. Day, 84 Texas, 607.

There was no error in the ruling of the court in refusing to give the

charge requested, to the effect that a mistake should be established beyond a reasonable doubt. What has been previously said disposes of this objection.

Nor was there any error in refusing the third special instruction asked by the appellant. The court in effect in its charge required the jury to decide all the issues submitted to them on a preponderance of the evidence. The appellees assumed the burden of proving the facts that would entitle them to a reformation of the instrument. Consequently, the charge of the court meant that this issue should be established by a preponderance of the evidence.

The twelfth assignment of error is in effect disposed of adversely to the contention of appellant in the previous portion of this opinion.

There is no merit in appellant's thirteenth assignment of error. Having recovered the full amount of its debt with interest, it was not entitled also to a judgment for rents. This in effect also disposes of the fourteenth assignment of error.

We find no error in the record, and the judgment is affirmed.

*Affirmed.*

### SUPPLEMENTAL OPINION.

In discussing the question as to the improbability of the parties intending to include in the deed of trust the lands actually cultivated, and which were shown beyond dispute to be a part of the homestead of appellees, we did not intend to express the opinion that the head of the family could not, in any instance, designate a different part of a large tract as his homestead, if done in good faith; but the idea intended to be conveyed was that the part of the survey which was in actual use and cultivation, if less than 200 acres, as a part of the homestead which was shown to be used and cultivated for the support of the family, could not be incumbered to secure a loan by reason of a designation made by the husband alone as his homestead of a part of the large survey, which at the time was unimproved and never cultivated and used in connection with the home. The facts in this case show that the designation was intended as a part of the transaction connected with the execution of the deed of trust, and that the land described in the designation excluded the principal part of the appellees' cultivated lands. And this, we think, is the principle decided in Affleck v. Wangermann, 93 Texas, 351, which is in keeping with the reasoning in the cases of Cervenka v. Dyches, 32 Southwestern Reporter, 321: "The husband and wife, together, of course, can not disclaim homestead in the farm and residence which are actually occupied as such, and designate the homestead on land not used as such, and incumber by mortgage the actual homestead. Nor can one or both of them disregard the obvious facts of improvements on the ground, and mortgage that which is necessarily the homestead. Railway v. Winter, 44 Texas, 611. The difficulty we have in the case before us arises from the fact that there was much

more than 200 acres of residence and farm land and land occupied by a gin. Ordinarily, in such cases, we believe the husband, acting in good faith, could exclude some of these lands from the homestead, and mortgage them, so that he did not reduce the land impressed with the homestead character below 200 acres, and provided he did not exclude the residence property. Thomp., Homest. and Ex., secs. 102-106. Still, it must be borne in mind that the homestead is not a personal privilege which the husband may waive, and he and his vendee or mortgagee must look to the physical facts,—not only to the land in use, but to its proximity to the residence and the character of the use, as well as other ·circumstances of prior incumbrances. House v. Phelan, 83 Texas, 597; 19 S. W. Rep., 140."

And in Railway v. Winter, 44 Texas, 609 to 614: "The leading objections to the charge are, then, in making the validity of the designation of the land, in protecting it against the bond, dependent upon the specific intention here indicated, and in making nothing short of the deceptive acts and conduct of Abercrombie (and they not disclosed and pointed out) sufficient to debar him from defeating the purchase of the land, by designating his homestead after the lien was acquired upon it, as applicable to the facts of this case.

"The Constitution exempts from forced sale 'the homestead of a family not to exceed two hundred acres of land.' Const. 1869, sec. 15, art. 11. It was first introduced in the Constitution of 1845, and has been reinserted in every Constitution adopted since that time.

"If the homestead is more than 200 acres of land, then only that quantity of it is secured; and if it be that or less, then all of it is secured. It is not defined in any of the Constitutions, nor are its qualities, attributes, or shape expressed further than in the use of the words, 'homestead of a family not to exceed two hundred acres.' That would imply, that it was thought to be something that could be known without any further description. It is a definite, ostensible object, to the extent of being the place which is made the home of the family. It has had some legislative interpretation. The Act of 1839, in which it originated, described it as 'fifty acres of land, or one town lot, including his or her homestead and improvements, not exceeding five hundred dollars in value.' Hart. Dig., art. 1270. So, too, the Act of 1866 describes it as 'two hundred acres of land, including his or her homestead.' Pasch. Dig., art. 6831. Homestead is defined to be 'the place of the house,' 'the mansion house, with adjoining land.' Worcester's Dic.; Bouvier's Law Dic.

"It has received judicial interpretation in many respects. 'A man's homestead must be his place of residence; the place where he lives.' Philleo v. Smalley, 23 Texas, 502. In the case of Franklin v. Coffee, Chief Justice Wheeler, in describing what is not a homestead, says: 'In this case there was no house or home upon the land. He had made no preparation or done no acts which would evince a fixed intention and purpose to select and appropriate the place as a home.' 18 Texas,

417. On the contrary, in the case of Stone v. Darnell, such acts were done as were said to indicate the intention to appropriate the place as a home, and although not a home literally when levied on, but being such at the sale, it was exempt as a homestead. 20 Texas, 15. The use made of the land may determine its character as part of a homestead or not, as well as its proximity to or remoteness from the residence or mansion house. Pryor v. Stone, 19 Texas, 373, 374; Methery v. Walker, 17 Texas, 594. Such use is an object of observation, which indicates and is notice of appropriation for homestead purposes.

"In 1845 most persons who lived in the country were in possession of tracts larger than 200 acres of land, and generally farms were attached to or situated near their residences. They were of no uniform shape or size; and still, then it was deemed a sufficient description of that which was secured to the family out of those large tracts to call it the 'homestead of a family.' The object of the Constitution was not to protect the house with 200 acres of the most valuable land that might be on a large tract, but to protect the house and the farm, tan yard, mill, gin, or whatever had been used in connection with the residence to make a support for the family.

"This was an object so definite and easy of ascertainment, even though its exact boundaries might not be defined, that the husband was prohibited by law from conveying it away, except with the consent of the wife. Everyone dealing with the husband had to take notice of its locality on the land. An officer could not levy on it and make a valid sale of it, even to one who never saw it or heard of its being the homestead of the family; nor would the matter be mended by its having been pointed out for levy by the husband.

"What is meant by 'the homestead of the family' in the country and its approximate locality is determinable by obvious facts, as a determinate object, and not by the variable intention, privately entertained, or openly declared by the husband, he and his wife residing on the land in their home at the time. Under the same circumstances, where the residence is on a large tract of twelve or fifteen hundred acres, most of which being uncleared, the locality of what portion of it is not a part of the homestead is determinable in the same way approximately.

"Suppose, for instance, a man residing in his house on a farm of 100 acres of land, on the northeast corner of his league of land, the balance all being uncultivated and not otherwise in use, is it not as certainly determinable, by the obvious appearances of fixed facts, that the 200 acres in the southwest corner of the land is not the locality of the homestead as that the homestead is located in the northeast corner, where the house and farm are?

"Suppose 100 acres in the southwest corner are levied on, can he defeat the sale by running out an acre around his house, and then running off a strip thirty feet wide three miles to a block, including

the balance of the 200 acres in the southwest corner of the league, and claiming the same as a homestead? If so, the wife can be deprived of the farm, or even of the garden at the door of the house, by another levy and sale. According to the opinion of Chief Justice Hemphill, he could not, in such a case, even move his house from one corner to the other, and claim a homestead after such a levy. In the case of Stone v. Darnell (20 Texas, 14), after laying down in the strongest terms that if it is the homestead on the day of sale, it is exempt, he says: 'This is the general principle. There may be and doubtless are exceptions; as, for instance, where one removes from his former homestead and fixes his residence on a portion of his lands upon which there had been a levy. Such proceeding would be regarded as fraudulent, which might be shown by the purchaser at the sheriff's sale, and would protect his title against the claim of the homestead thus fraudulently acquired.' Such a principle would hardly be conceded as an exception by the great champion of the homestead right unless it had been good law. In the sale of real property under execution, it is the judgment that gives the lien and secures the right, rather than the levy, which but locates it, to be perfected by sale. This is termed by the chief justice an exception to the general rule. It is respectfully submitted, that the case he states is rather the enforcement of a lien that underlies the attempted acquisition of a new homestead, rather than an exception. If he has plenty of other land to pay the debt, he may exercise the right of pointing out property to be sold, and thereby relieve a particular tract on which there was a judgment lien. There could be no fraud in that. But that would not be a defeat of the lien on the land by a relocation of the homestead. In the case which was supposed by me, of a homestead on the league of land, the house and farm, and the uses made of them, spoke a silent language, proclaiming the locality of the homestead to everyone. It is a designation of the homestead more authoritative and notorious than lines run through old fields, prairies, or even woods by the husband. And if the lines be run in the way supposed, it is no less an attempt to make a new homestead, as to its boundaries, than if the house had been moved to the new locality after the lien had been acquired. The facts and circumstances surrounding the actual homestead constitute, in and of themselves, a designation of the locality, with approximate though not definitely and exactly fixed boundaries. Under this idea, Chief Justice Wheeler said, in the case of Mackey v. Wallace, 26 Texas, 529: 'It would seem, moreover, that it is the right of the debtor to designate the land included in his homestead exemption, subject only to the qualification that he must include his improvements.'

"Why include the improvements? Because the use of the improvements is the object of a residence in the country as a means of support, the security of which to every family it was the cherished object of the framers of the Constitution to attain, by the exemption of the homestead. They enter into and form part of the homestead. As to how

much of the improvements, and how much unimproved or woodland may be included in the 200 acres selected and designated as a homestead, is not subject to any fixed rule, and about which there must be a liberal discretion, limited only by the rights of the wife in the homestead and by the rights of other persons acquired in the land while it is not a part of the homestead."

There is an expression on page 6 of the dissenting opinion of the associate justice, which possibly needs some explanation. It is stated in the opinion, speaking of Pace's evidence: "It was intended that the 144 acres should adjoin the 56 acres on which he (Pace) resided, so as to make his homestead in a solid block, and that he would not have executed the homestead designation had he known that it would separate his homestead into two tracts."

All the evidence found upon this subject which is stated on page 80 of the record is as follows: "That does not express the verbal agreement between Brown and myself. I would like to make this statement: If this land had run up as far on this line as I expected, an ordinary guess would throw those adjoining surveys there about the course that those papers call for, but we had no instrument to set there to show the exact degree at all. There was a great deal more land east of the creek than I thought there was when those papers were drawn. When I executed the designation of homestead, I thought I was setting apart my homestead in a solid block. I would not have done so if I had known it was not in a solid block. I do not know now whether it would lie in a solid body according to what I said was the agreement. My intention was to put it all together. The controlling idea in designating my homestead was to embrace all the cultivated land. There was a great deal more land than I thought there was east of the creek. I thought the 144 acres would run up on the east line of the 56 acres and throw my land all in a body, but it did not do it."

The quotation from the dissenting opinion is likely to convey the idea that it was the intention of both parties to the deed of trust that the entire homestead reservation should lie in a solid body. Such is not the effect of Pace's evidence. It is to the effect that he intended it that way, and thought that the 144 acres would adjoin the 56-acre tract; and this intention and supposition of his arises out of the fact that he was mistaken in the quantity of land that lay east of the creek.

The dissenting opinion also states that it was one of the controlling ideas of Pace in making the designation that the entire homestead was to lie in a solid body. This conclusion, we think, is not borne out by the record; but, upon the contrary, the evidence of Pace is to the effect that the controlling idea in designating his homestead was to embrace all of the cultivated land.

On page 69 of the record he testified, that "I pointed out to him [meaning Brown] what land was to be covered by the field notes. The verbal agreement with Brown was that the deed of trust should cover all of the land west of the creek, and to reserve 144 acres southeast

end of the tract, where the cultivated land was, as my homestead. The north line of this was to be a parallel line with Beckett's 987-vara line. That agreement was understood between all the parties to the transaction."

Further, on page 70 he testifies, "that the understanding was that the deed of trust was to cover all the pasture land. The deed of trust covers most of the farm land that was in cultivation, and would cover about 80 or 90 acres of the land now in cultivation, and would leave very little of the land, except out of the 56-acre tract which was in cultivation when the deed of trust was executed. I did not understand that the deed of trust covered the cultivated land in the southeast end of the tract. If I had so understood it, would not have executed it."

On page 71 of the record he states, that the cultivated land in the southeast end has been used and cultivated for twelve or fifteen years, and he relied upon it to support his family.

On page 74 of the record he states, that since the execution of the deed of trust he has put 60 acres in cultivation, of the land covered by the deed of trust; and says that he thought it was a part of the homestead, otherwise he would not have put it in cultivation. It was put in cultivation about 1891.

On page 77 of the record he states: "The field notes which I intended should cover my homestead would not quite include all the land in cultivation at the time the deed of trust was made, but very nearly all of it. I thought at the time and until recently that all of the land in cultivation was in my homestead."

On pages 77 and 78 of the record he states: "When I borrowed the money there was a verbal agreement between us that the deed of trust was not to cover the cultivated land. I did not know then that according to the field notes verbally agreed upon a part of my cultivated land would be covered by the deed of trust. I expect now the deed of trust as agreed upon would cover a little of the cultivated land; but it was my intention at the time that it should not cover any of the cultivated land, and it was so agreed between us."

On page 78 of the record he states: "I said there were 496 acres in the whole tract; the Nolan tract was not included."

On page 80 of the record, he states: "The controlling idea in designating my homestead was to embrace all the cultivated land." The other testimony bearing on the question of the identity and description of the land, and as to the controlling purpose and intention of the parties, is set out in the original opinion.

We have stated evidence which is clearly sufficient, showing that it was the intention of the parties, not of Pace alone, to locate the 144 acres in controversy in the southeast end of the tract, so as to embrace the cultivated land. This evidence went to the jury, and they have given it effect by their verdict in favor of the contention of appellees, and the conclusion reached by them is binding upon this court.

The view taken in the dissenting opinion that the prominent purpose

of Pace was that the 144 acres and the 56 acres should lie in a solid body, is argument that could be properly urged if the matter was now under submission before the trial court; but a jury and the trial court having determined that the controlling idea of the parties was not as stated in the dissenting opinion, but that the 144 acres should be located in the southeast end of the survey, and there being abundant evidence to support this conclusion, it must be regarded as finally settled, so far as lies within the power of this court to disturb it.

The verdict of the jury was with the appellees on the issue of mistake according to the manner in which that issue was pleaded. The answer definitely set out the mistake and described the lands which by mistake were not reserved, but which should have been, from the operation of the deed of trust. The finding of the jury in favor of the appellees on the issue of mistake was necessarily a finding to the effect that the mistake should be corrected as pleaded.

The evidence as quoted, together with that stated in the original opinion, whatever may be said of the then existing intention and desire of Pace to have his homestead lie in a solid body, is clearly sufficient in warranting the conclusion that it was the intention of both parties to the contract that the 144 acres should be taken out of the southeast end of the tract, so as to embrace the cultivated lands of appellees. And, as stated, there being evidence to support this conclusion, the judgment of the trial court following it and giving it effect, can not be disturbed by us, unless it clearly appears that there were no facts in evidence upon which to base it.

Filed March 28, 1900.

### DISSENTING OPINION.

KEY, Associate Justice.—Being unable to concur with his associates in the disposition made of this case, the writer, as required by statute, will state the reasons for his dissent.

There is much in the strong opinion of Chief Justice Fisher that meets my hearty approval, and especially that portion of it which holds that a written instrument may be reformed upon the testimony of one uncorroborated, credible witness, though contradicted by other witnesses.

It is not believed that property rights, though secured by written instruments, are of greater sanctity than life and liberty; and as the law will permit the citizen to be condemned to the gallows or to prison upon the testimony of one such witness, it is illogical and unreasonable to hold that a written instrument affecting only property rights may not be reformed upon like testimony.

My dissent in this case is based upon two propositions, which are: (1) there is latent ambiguity in the judgment as disclosed by the testimony, which renders uncertain the location on the ground of the 144 acres of land reserved from the trust deeds as part of appellees' home-

stead; and (2) the testimony upon which the judgment is based, in so far as it relates to the locality of the 144 acres of land intended to be reserved from the trust deeds, is too indefinite and uncertain to support the verdict and sustain the judgment reforming the trust deed.

1. It is not denied that the map made by the witness Wallace is a correct delineation of the land, including the two fields in cultivation on that portion of the land outside of the 56-acre tract. The description in the judgment of the 144 acres is as follows: "Bounded on the west by D. C. Pace's 105-acre tract; on the south by the original south line of the James R. Pace survey; on the east by the Nolan tract and the 60-acre tract of Stanley, and on the north by a line running parallel with the south line of this tract at a sufficient distance north of said line to give 144 acres, which north line of this tract is also parallel with the 987 vara line on the south of Beckett's tract, mentioned in said deed of trust."

An inspection of the map shows that the Nolan tract lies in the southeast corner of the J. R. Pace tract; its south line being identical with the south line of the Pace tract for about two-thirds of the distance from the southeast corner of said Pace tract to the southeast corner of the D. C. Pace 105-acre tract. From its southwest corner, the Nolan runs south 30 west 153½ varas; thence north 60 E. 551 varas; thence south 30 W. 130 varas. The judgment describes the 144 acres as bounded on the south by the J. R. Pace south line, and on the east by the Nolan tract and the Stanley 60-acre tract.

To my mind it is uncertain from this description whether the Nolan tract is to be included in or excluded from the 144-acre tract. If the Nolan tract be excluded, it will not be bounded on the south for more than half the length of the south line by the Nolan survey, and will be bounded on the south by the Nolan to the extent of 551 varas. In fact, according to the map, if the Nolan be excluded, there will be as much of the south boundary on the Nolan as on the Pace. True, it may be necessary to exclude the Nolan in order to get the full width of that survey as an eastern boundary; but it seems to me that the call for the south line of the J. R. Pace survey as the south boundary of the 144 acres, and the failure to give the Nolan line as any part of the south boundary is of as much force as the call for the eastern boundary of the Nolan, especially when that boundary consists of two fragments 551 varas apart, one of which is as near the west side of the main body of the 144 acres as it is the east side thereof.

I do not say that it was the intention of the decree to include all or part of the Nolan survey in the 144 acres; but, in view of the call for the J. R. Pace south line and for no other southern boundary, my conclusion is that the decree is ambiguous when applied to the facts disclosed by the testimony; and that it can not be determined whether the Nolan tract should be included or excluded.

Again, the decree describes the 144 acres as bounded on the east in part by the 60-acre tract of Stanley, and no reference is made

to the Singleton tract, which according to the map lies immediately north of the Nolan, west of the Stanley, and east of appellees' 65-acre field. In other words, the decree describes the 144 acres as bounded on the east by the Nolan and Stanley tracts, and does not refer to any other survey as an eastern boundary; but to hold that the 144 acres is bounded on the east by the Nolan and Stanley tracts only, and not by the Singleton also, would cause it to include the latter survey which is not embraced in the trust deed. The decree follows the description given in appellees' pleading, and it is not reasonable to suppose that they intended to reserve from the deed of trust land not embraced therein; yet, according to the language of their pleading and the decree of the court, it seems that the Singleton tract would constitute a part of the 144 acres so reserved by the decree; and this fact creates another element of uncertainty as to the location of the 144 acres to be reserved from the deed of trust.

2. The verdict of the jury states in terms that a mutual mistake was made in the execution of the trust deed; and in effect finds that the 144 acres intended to be reserved as a part of appellees' homestead was and is the land described in appellees' pleadings and so reserved by the decree of the court. This specific finding of mutual mistake eliminates the question of fraud, and any right which appellees may have had to annul or rescind the trust deed on account thereof.

In Howard v. Zimpelman, 14 Southwestern Reporter, 62, the present Chief Justice of our Supreme Court, speaking for the court, said: "It is against the policy of the law that a written instrument should be shown by parol testimony to have an effect different from that which its terms import, except upon very strong proof." And the authorities in other jurisdictions are almost unanimously in accord upon the proposition that, in order to correct or reform a written instrument upon the ground of mutual mistake, the proof of the mistake must be definite, certain, and, as often said, beyond reasonable doubt. However, our own Supreme Court has held that it is not proper in such cases to charge the jury that the facts relied on to accomplish that result must be established with certainty or beyond reasonable doubt.

In the case just cited it is said to be proper in such cases, to instruct the jury as to the legal effect of the written instrument, and tell them that the parties to it are presumed to have intended that it should have that effect; but that the jury should find otherwise, provided the evidence be sufficient to overcome that presumption, and to reasonably satisfy them that it was intended otherwise than as stated in the instrument. The opinion had previously stated that it was misleading to instruct a jury that the burden of proof was upon the defendants to establish clearly and with certainty by a preponderance of evidence, that the instruments were executed for some purpose other than that expressed in them.

This court held this to be misleading because certainty means the absence of doubt; still the charge recommended by the court requiring the evidence to reasonably satisfy the jury, would antagonize a former opinion of the same court in Baines v. Ullmann, 71 Texas, 537, in which the use of the word "satisfy" in a charge is condemned; the court saying in effect that evidence does not satisfy the mind unless it frees it from doubt or uncertainty.

In my judgment, there is no substantial difference between the expressions "prove with certainty," or "to the satisfaction of the jury," or "beyond a reasonable doubt." If the evidence leaves the fact sought to be established in reasonable doubt, then it is not proved with certainty, nor to the satisfaction of a fair and impartial mind; and when it is sought to reform a written instrument upon the ground of mutual mistake, if the evidence is not of this character, in my opinion the instrument ought not to be reformed; and it ought to be permissible to announce this rule of law in the charge to the jury. Railways v. Shirley, 45 Texas, 377; Pom. Eq. Jur., sec. 859; 15 Am. and Eng. Enc. of Law, 650, and cases cited in note. Not only must there be satisfactory proof of mutual mistake in the preparation of the written instrument, but, in order to reform it and make it apply to other property or differently from what is stated in the instrument, the party seeking to accomplish that result must show with certainty and particularity how the instrument should have been written.

In the case at bar, the appellees sought to borrow and did borrow money from appellant. In order to secure the loan, they offered to execute a trust deed on about 300 acres of land, it being the excess after deducting their homestead from a body of land comprising 496 acres, which they owned and had inclosed, either as fields in cultivation or as pasture; and the testimony shows that they were using the pasture land for the purpose of grazing their stock, and were also deriving some revenue from it by pasturing stock for other people.

Under these circumstances Pace had the power, in my opinion, to designate the 144 acres reserved in the trust deed and contiguous to the 56-acre tract upon which he resided, as part of his homestead. And if it was so designated he could then or thereafter legally incumber the residue, although he may have been cultivating a portion thereof. I believe the opinion of our Supreme Court in the case of Affleck v. Wangermann, 55 Southwestern Reporter, 313, cited in the majority opinion, sustains this proposition. If I am correct in this, appellees were confronted with a valid written deed of trust, executed by them, free from ambiguity; and in order to alter or change its meaning and effect, it devolved upon them not only to show that they did not intend to reserve the 144 acres described in the trust deed as part of their homestead, but that they intended to reserve a different and specific 144 acres, which can be pointed out and identified upon the ground;

and that this intention was known to and concurred in by the Browns, who were acting for appellant; and that the land so agreed to be reserved is the identical land described in their plea.

The testimony relied on for this pupose is that given by Pace himself. He states that the Browns did not go upon and examine the land themselves; that he furnished them an abstract of title and told them that he wanted the 144 acres reserved as part of his homestead to come out of the southeast end of the 496-acre tract, and to include all of his land then in cultivation. He also stated that it was intended that the 144 acres should adjoin the 56-acre tract on which he resided, so as to make his homestead in a solid block, and that he would not have executed the homestead designation had he known that it would separate his homestead into two tracts. He stated that the 144 acres, after correcting the trust deed to conform with his contention, would not include all of the old Pace field that was in cultivation when the instruments were first executed; and the map in evidence confirms this latter statement, and indicates that a considerable portion of the land then in cultivation is excluded from the 144 acres reserved by the decree. However, he did not pretend to know or state the exact amount of the old Pace field that was included in the reservation in the trust deed. But Wallace, who surveyed the lands, and whose testimony is not controverted, shows that the old Pace field contained only 65¾ acres, and that about 25 acres of this is embraced in the 144 acres reserved from the trust deed before its correction. It is also shown by his testimony, as well as that of Pace, that the homestead as originally reserved is in a solid body, as Pace swore he intended it should be; while according to the decree, even if the Nolan tract be excluded from the 144 acres, that tract would be disconnected from the 56-acre tract on which appellees reside.

If the deed of trust is to be corrected at all, it must be done in accordance with the averments in appellees' pleading. It is not sufficient to show a mistake in its preparation, and that the intention was to reserve another and different 144 acres as part of the homestead; but appellees' proof must go further and show that the mutual purpose was to reserve the identical 144 acres described in their pleading. In my judgment, this they have utterly failed to do. Pace, nor any other witness, does not state that the boundaries of the 144 acres given in appellees' pleading and carried into the decree, were agreed upon between the parties. There was a plat of the land attached to the abstract of title furnished by Pace to Brown and used by him in the preparation of the homestead designation and deed of trust; but it is not shown that the plat referred to had the Nolan survey marked upon it. The testimony shows that Pace had made no deed to the Nolan tract, and that it had no written field notes; and it was not shown that Brown and Pace agreed to call for its east lines as the

boundary of the 144-acre tract; nor does Pace's testimony show that the parties agreed that the 144-acre tract should extend west to the D. C. Pace 105-acre tract.

As I read Pace's testimony in reference to the intended location of the 144-acre tract, two controlling purposes were in view; and these were that the 144 acres should be contiguous to the 56-acre tract so as to preserve the homestead in a solid block, and all of the land then in cultivation was to be embraced in the homestead reservation. All other matters of description were subordinate to these cardinal purposes, and any reformation of the trust deed which does not accomplish this result is not in accordance with the main purposes disclosed by Pace's testimony.

The reformation sought by appellees and accorded by the decree of the court does not accomplish either of these objects. It separates the homestead into two disconnected bodies and it does not include all the land in cultivation. If it had been sought, it may be that a decree could have been rendered connecting the two surveys and reserving all the land in cultivation at the inception of the transaction under consideration. To have done so would have disregarded some of the other matters of description, which were of minor importance; and whether or not a court of equity would have been justified in granting such relief need not now be determined. It was not sought, and the question now is, were appellees entitled to the relief they saw proper to seek?

In my judgment, the reservation in the homestead designation and trust deed are as much in accord with the prime objects disclosed by Pace's testimony as is the reservation established by the decree. Pace states that it was his intention that the 144 acres should so connect with the 56 acres on which he and his family resided as to leave his homestead in a solid block, and this object the deed of trust accomplished. He further states that he would not have signed the designation of homestead had he not thought that he was setting apart his homestead in a solid block. This testimony shows clearly that he then had the fixed and controlling purpose, not merely to keep his homestead in two connected tracts, but to preserve it in a solid block, as was done by the designation by which the 144 acres connected with the 56 acres on the south and east, leaving the homestead in the shape of a parallelogram, except some irregularity in the lines on the northwest end. It is true that the reservation referred to does not include as much of the land then in cultivation as does the reservation contained in the decree; but neither include all the land then in cultivation. So it appears to me that the reservation contained in the original instruments accomplished one of the prime objects intended by the parties, while the reservation contained in the decree does not accomplish either of said objects.

Because there was no evidence sufficiently identifying the 144

acres reserved in the decree as homestead, as intended by the parties to be reserved, I think the court erred in not giving appellant's requested instruction directing a verdict for it, and in not setting aside the verdict after it was rendered.

Filed March 28, 1900.

Writ of error refused.