MISSOURI, K. & T. RY. CO. OF TEXAS v. MORGAN.

(Court of Civil Appeals of Texas. Austin. Jan. 28, 1914. Rehearing Denied March 4, 1914.)

1. ACCORD AND SATISFACTION (§ 11*)—COMPROMISE AND SETTLEMENT (§ 6*) — WHAT CONSTITUTES—ACCEPTANCE OF CHECK—PERSONAL INJURIES.

The acceptance of a check and collection of the amount thereof, knowing that it is tendered in settlement of a personal injury claim, will constitute an accord and satisfaction, though the check is not strictly a release in law.

[Ed. Note.—For other cases, see Accord and Satisfaction, Cent. Dig. §§ 75–82; Dec. Dig. § 11;* Compromise and Settlement, Cent. Dig. §§ 35–50; Dec. Dig. § 6.*]

2. ACCORD AND SATISFACTION (§ 20*)—COMPROMISE AND SETTLEMENT (§ 8*)—ACCEPTANCE OF CHECK—FRAUD.

Where an injured employé is induced by the conduct of the employer's claim agent to believe that a check tendered him is merely in settlement of his claim for wages, when in fact it states on its face that it is in settlement of his claim for personal injuries, and he cashes the check without knowledge of such provision, he may avoid the effect of the check as an accord and satisfaction for his injuries, on the ground that it was fraudulently procured.

[Ed. Note.—For other cases, see Accord and Satisfaction, Cent. Dig. §§ 140–142; Dec. Dig. § 20;* Compromise and Settlement, Cent. Dig. §§ 17–31, 33; Dec. Dig. § 8.*]

3. RELEASE (§ 17*)—AVOIDANCE—FRAUD.

Where an injured employé is induced by fraudulent representations of the employer's claim agent to sign a release without reading it and in the belief that it is not a release of his claim for personal injuries, his failure to read the release will not prevent him from asserting its invalidity.

[Ed. Note.—For other cases, see Release, Cent. Dig. § 32; Dec. Dig. § 17.*]

4. APPEAL AND ERROR (§ 994*)—SCOPE OF REVIEW—CREDIBILITY OF WITNESSES.

Plaintiff's credibility as a witness and the credibility of witnesses tending to impeach him was for the jury and not for the appellate court.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3901–3906; Dec. Dig. § 994.*]

Appeal from District Court, Travis County; Geo. Calhoun, Judge.

Personal injury action by W. C. Morgan against the Missouri, Kansas & Texas Railway Company. From judgment for plaintiff, defendant appeals. Affirmed.

Fiset, McClendon & Shelley, of Austin, for appellant. Dickens & Dickens, of Austin, for appellee.

KEY, C. J. This is a personal injury suit, which resulted in a verdict and judgment for the plaintiff for $300, and the defendant has appealed.

The defendant's answer included:

(1) A general demurrer.

(2) A general denial.

(3) A plea of contributory negligence.

(4) "That, if plaintiff ever had any cause of action, it had been fully settled, compromised, and adjusted, and same had been released in full by accord and satisfaction, in that heretofore, on or about the 2d day of May, A. D. 1911, the plaintiff and defendant entered into an agreement whereby the defendant agreed to pay to the plaintiff, in full settlement, satisfaction, and accord, and in full compromise of all claims which plaintiff might have against the defendant arising out of said alleged accident, the sum of $11, which said sum was on or about said date paid by the defendant to the plaintiff, which said payment was evidenced by a certain check or draft in writing issued by this defendant through its claim department, and drawn by defendant's general claim agent on its treas-

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

urer, which said check or draft reads in words and figures as follows, to wit:

" 'FF　EFP　12, May 1911　~~784 April 1911~~
　" 'Form 1035 Tex　5—10—80 Bks.
" 'The Missouri, Kansas & Texas Railway Co.
　　　　　　of Texas.
" 'No. 15307.　　　　　　　　　　　$11.00
　　　Smithville, Texas, May 2d, 1911
　" 'At sight when countersigned by R. F. Hyde, Jr. pay to the order of W. C. Morgan, eleven and no/₁₀₀ dollars for personal injuries sustained on or about Feb. 16th, 1911, near Pflugerville, Texas, while employed as sec. foreman, caused by falling from push car while attempting to step from same to hand car.
　" 'To R. P. Roach, Treasurer, Dallas, Texas.
　　" 'A. A. Krause, General Claim Agent.
" 'Countersigned: R. F. Hyde, Jr.'

"That the plaintiff accepted and received said check or draft in full settlement and satisfaction of said claim, indorsed said draft on the back thereof by writing his name thereon in blank, and presented said check or draft to one W. F. Southern, the agent of this defendant at Sprinkle or Pflugerville, Tex.; and said agent, on the presentation and surrender of said check or draft by the plaintiff, with the indorsement of plaintiff thereon, paid over to the plaintiff the said sum of $11 out of the funds of this defendant. Wherefore this defendant says that whatever, if any, claim or cause of action plaintiff may have had against the defendant, by virtue of any of the matters set forth in plaintiff's petition, have been fully settled, adjusted, and compromised, and that plaintiff has received full accord and satisfaction therefor."

And (5) that, in consideration of the payment to the plaintiff by the defendant of $11, the plaintiff, in addition to accepting the draft above referred to, executed a release in writing in full settlement and compromise of his alleged cause of action, but that said release had been lost.

The plaintiff filed a supplemental petition which, in addition to a general denial of the allegations contained in the defendant's answer, contained a plea of fraud and mistake concerning his acceptance and collection of the draft referred to.

We copy from appellant's brief the following as a fair statement of the substance of all the testimony bearing upon the question submitted to this court:

"The plaintiff testified upon cross-examination that he was in bed 12 or 13 days and started back to work about three days after he got out of bed; that he lost 15 or 16 days; that after he went back to work he worked four or five months in the same employment; that he was then relieved. After that he worked for the oil mill at Pflugerville four months, and later for Mr. Kilgore, a blacksmith at Pflugerville, and then in December, 1911, he went to work as section hand for the defendant under Mr. Wells, section foreman

at Pflugerville. At that employment he worked about six weeks, and was then given a section by defendant at Sprinkle, and after working six weeks as section foreman he was again discharged. He places the time of his last discharge in February or March, 1912. He then details the different employments he had been in since he was discharged, showing various employments at different times at hard manual labor. At the time he was first hurt, February 16, 1911, he had been working three or four months for the defendant as section foreman. He identified the sight draft pleaded as a release by defendant, and admitted having received it, indorsed and cashed it with the agent of the company at Pflugerville. This instrument is set up in hæc verba in the answer, and is also set out in full in the statement of facts. This draft or check was introduced in evidence by the defendant without objection, and was on the company's regular form. It was an ordinary sight draft, dated May 2, 1911, drawn by the general claim attorney, countersigned by R. F. Hyde, Jr., and drawn on the treasurer of the company at Dallas, the amount being $11, and in the body of the draft or check appeared the following: 'For personal injuries sustained on or about February 16, 1911, near Pflugerville, Texas, while employed as section foreman, caused by falling from, push car while attempting to step from same to hand car.' The check was indorsed on the back, 'W. C. Morgan; W. F. Southern, Agt.,' and bore the stamp of the Pflugerville office under date May 11, 1911, and the 'paid' stamp of the American National Bank of Dallas, under date May 1, 1911. The witness also testified that some papers were sent to him by the company at Sprinkle about four or five days before he was relieved the last time. These papers were introduced in evidence by the plaintiff and consisted of a blank form of release, a blank form of voucher, and a letter from claim agent Hyde, reading as follows: 'PT—32717. W. C. Morgan, Smithville, Texas, February 24, 1912. Mr. W. C. Morgan, Pflugerville, Texas—Dear Sir: On May 2, 1911, I sent you, by roadmaster, draft 15307 for $11 account injuries sustained by you on February 16, 1911. Somehow the papers were misplaced in returning them, and I have never received the release and voucher. I am inclosing you herewith a duplicate release and voucher, and would thank you to kindly execute same and return to me by return mail. This that my records may be complete. Thanking you in advance, I am, Yours truly, R. F. Hyde, Jr., Claim Agent. H-Encl.'

"With regard to the circumstances under which he received, accepted, and cashed the check or draft, the plaintiff testified: 'I got $11 from the company. Mr. Rich gave it to me. He stopped the local one morning and gave it to me. He gave me a check for $11

and I took it and cashed it that day when I went in at noon. The agent at Pflugerville, Fields Southern, cashed the check for me. I signed the check. I guess Mr. Southern is agent there yet. This is my signature, but I could not tell you whether this is the check or not. I never read the check; he told me that it was for the time I lost; and I did not read it at all. I can read. I just took his word for it and took the check down there and cashed it. I indorsed the check; that is my handwriting where I indorsed it. It was out on the north end of the track when I received that check. I got it off the local. Mr. Rich gave it to me. They stopped the local freight out on the north end and handed me the check. I asked Newt Rich, the roadmaster, if they would pay me for the time I lost, and he said he would see about it. It went on for about a couple of months, as well as I remember, and he came over and asked me if I would accept half time. I told him I thought they ought to pay me for the time I lost while injured. Well, it went on and went on for several days, and he came over again and he said they would give me only half time. It had been going on for a couple of months, and I had asked him about it several times, and he said they didn't want to give me more than half time, and I told him I would take that for the time I had lost. There was nothing said about my injuries at all. Nobody talked to me about my time except Mr. Rich. There was nothing said in any of these conversations about settling with me for injuries or damages; there was nothing mentioned about it at all. When they gave me that check they did not tell me that it was in settlement for injuries sustained. The local freight just stopped there a few minutes, and Mr. Rich gave me that check. I asked when it was, and he said it was for the time I lost while unable to work. There was nothing said about injuries at all. It was about 11 o'clock in the morning, and I was in a hurry, as I had a lot of track torn up, and I put the check in my pocket, and, when we went in at noon, I just took it out and signed and gave it to the agent and he cashed it. I was in a hurry and didn't read it. Mr. Rich told me it was for half time lost, and I took his word for it and never looked at it. That $11 figured out somewhere about half the time I lost. No one at any time mentioned to me that that was in full settlement for any injuries that I had sustained or for any suffering that I might have in the future. I never had any talk with any one at all except Mr. Rich, and that was just about my wanting pay for the time I lost. I worked for the company by the month, and received $55 a month. When they settled with me after the accident, they did not pay me for the whole month. They deducted the time lost from my month's pay. Mr. N. G. Rich was roadmaster. I knew Mr. Rich while I was working out there. He and I had several con-

versations about the time I lost on account of my injury. Several different times I talked to him about it and told him I would like for them to pay me my time, and finally he asked me if I would accept half time. I told him I would rather have it all, if I could get it. I spoke to him several times about it, and he finally said that they would not agree to give me more than half time. Mr. N. G. Rich was the man that gave me that check. I don't remember exactly the date when he gave me the check. I was out about a couple of miles from town when he gave me the check. I was working on the track out there at the time. I had a lot of the track torn up and was working on it when he gave me the check. He gave me the check at the back end of the train, the local freight. As to what he said to me at the time, he said, "Come here and get this thing, and hurry;" and I asked him what it was; and he said it was a check for the time I lost; and I got it and the brakeman gave a signal to pull out. Mr. Rich did not in any of those conversations say anything about settling with me in full; it never was mentioned. When he gave me the check I just put it in my pocket and went ahead fixing up the track. I was in a hurry; and it was getting close to noon, and I put it in my pocket and went on; and at noon when we went to town I went into the depot and signed the check and told the agent to give me the money on it. He asked me what it was, and I told him it was a check for the time I had lost. I didn't think there was any use to read it. Mr. Rich told me it was for the time I lost, and I took his word for it and didn't read it. If I had known what the facts were in regard to the check I would not have signed it. Mr. Rich did not make any explanation or talk to me about settling with me in full for $11, in any of those conversations; there wasn't anything at all said about that. The $11 was figured as half pay for the time I had lost while injured. After that I received some papers from the company. I did not sign those papers. I did not sign the papers because I had not signed any and didn't intend to sign any. When I received those papers was the first I heard or knew of any release. I was at Sprinkle when I received those papers. If I get a judgment in this case I am willing for the company to deduct the $11 they paid me from the amount of the judgment. When I accepted that check I did not accept it as being a release in full. I accepted it as pay for half the time I had lost while injured. They had that check already made out when they came up on the train and gave it to me. They did not read it to me.' Recross-examination: 'As to when Mr. Rich first talked with me about allowing me half time, I don't remember exactly when it was; as well as I remember, it was something like three weeks or a month after I got so I could get around; it was while I was working for the

company; it was about three weeks after I had started back to work. That was the first conversation I ever had with him about any allowance for time lost. They had already taken out of my pay the time I had lost; they had already paid me for the time I had worked, but did not pay me for the time I had lost. I don't remember exactly what Mr. Rich told me in that first conversation. I don't remember what was said, but I asked him if they could not pay me for the time I had lost, and he said he didn't know whether they would or not. He just said, "I'll see about it." He didn't say whom he would take it up with, but said, "I'll see about it, and see what they will do." I don't know who he was talking about when he said he would see what they would do; he certainly was talking about somebody besides himself. I understood that to mean somebody else connected with the company. I understood that the money was coming from the company. I asked Mr. Rich if they would not allow me something for the time I had lost. I told him I would like to have pay for the time I had lost, as I needed it and was not able to work. All he said was that he would see about it and see what they would do. In that first conversation he didn't say anything about half pay. I don't remember how long it was after that until I had my next conversation with him. I don't know how many conversations I had with him before he came with the draft or check. I suppose we had four or five different conversations. On the other occasions he said, "They have not decided what they are going to do about it." He never did tell me what they had decided to do before he brought the draft there, but one day he came there and asked me if I would accept half time. He was passing over the road and asked me one day if I would accept half time. I told him I didn't know. I would study about it and let him know the next time I saw him, and the next time I saw him I said, "I guess I might as well take it." The next time he was over the road, a little while after that he brought the check over. I did not tell Mr. Rich, on one occasion when we were discussing the matter, that I would accept anything the company would pay me. There was nothing said at any time about my injuries; it never was brought up. There was nothing said about paying me for injuries. There was nothing said about any claim I had against the company. There was nothing said about any damages or any suit. There was nothing said about paying me for my injuries at all, or about any suit, or anything of that kind. All that was said between us was that I asked if the company would pay me for the time I had lost, and he finally asked me if I would accept half time, and I agreed to it. I can't say exactly when I received the draft, nor how long it was after I had agreed to accept half time. I received the draft somewhere along after

the 2d day of May, 1911. Mr. Rich came through, going north on the local freight; I guess it was about 10:30 or 11 o'clock, or something like that. I was working on the section, and he stopped the train and said, "Here, come up here and get this." I asked him what it was, and he said, "This is for the time you lost." He did not have any other papers there that I remember of. I won't say whether I signed a release on that occasion or not. I don't remember signing one. I would not say for sure whether I did or not. As to who was present there, I don't remember who was on the train. Mr. Guinn was not there. I don't remember if he was there. I put the draft in my pocket then and cashed it the same day. When I went to Mr. Southern to cash that draft I did not tell him that that was for my injuries. I did not tell him that I had settled with the company and that the draft was for my injuries. I know Mr. Kilgore, the man I worked for out there. While working for him I did not tell him I had made a settlement with the company. I never told him anything of the kind. I know Mr. W. H. Gardner. I think he is timekeeper at the oil mill. I never made any statement to Mr. Gardner that I had made a settlement with the company. I never said anything to him about the case at all. I know Mr. Guinn. I never told him that I had settled with the company. I know Mr. Wells. He is section foreman out there. I worked under Mr. Wells along last December, 1911. I worked for him about six weeks. I did not tell him that I had settled with the company. I told him I was hurt all the time I was working for him. I never made any statement to Mr. Wells to the effect that I had settled with the company. I knew all the time that I was hurt. I knew it from the moment I fell off the hand car. I worked for the company about five months after I was hurt. I worked until the last of July, I believe, working continuously after I went back to work. Then they discharged me. I never consulted a lawyer or brought any suit, nor did I think about bringing suit until after they discharged me. I applied to the company for employment again along in December of that year, and got it. I worked six weeks as a laborer, and they then put me on another section, and I worked about six weeks or two months on that section as foreman, and then was discharged again. As to whether the time when I received this duplicate release from the company with a request that I sign it was the first time I ever thought about bringing suit, I had to make a living, and I didn't think I was able to make a living the way I was hurt, and I had to have some way of getting along. I didn't feel like I was able to do hard work. The reason I brought suit was simply because I could not do hard work. I received those papers by railroad mail. The agent delivered them to me in an envelope.

As well as I remember the envelope was sealed up. I don't remember now whether there was a letter with the papers or not. I read those papers, but it has been some time ago. I think there was a letter in there stating that they wanted me to sign the papers. There was a letter or memorandum or something telling me what to do with those papers. I think I turned that paper over to my lawyer, with the other papers. I think I turned everything over to him. I don't remember the date when I received that letter written by Mr. Hyde. It was while I was working for the company, and a few days before I was discharged the last time. I never replied to that letter. I never wrote to Mr. Hyde to even acknowledge receipt of that letter. I hiked down to a lawyer with all those papers, and the next thing they heard from me was that I had filed suit. The first time I knew that that check was in full settlement for my injuries was when they sent me those papers to sign. That letter states that that check was sent to me in payment for my personal injuries, but I didn't know anything about it; that was the first time I knew anything about it. When I got that letter I found out that they claimed I had signed a paper as a full release, but I didn't know anything about it. I found out, then, that they claimed that that check was in full settlement, and that they claimed that I had executed a release. I never offered that money back to the company. I thought the check was for the time I had lost. I didn't know anything about the money being for the injuries at all, but when I got that letter I knew that was what Mr. Hyde claimed it was for. I did not try to investigate it, but took those papers to my lawyer and instructed him to bring suit. It is not a fact that I thought I had executed a release up to the time I received that letter. I never thought anything of the kind. It is not a fact that I did execute a release, and that when I found out that the release had been misplaced I placed the matter in the hands of an attorney. The first I knew about a release was when they sent me those papers. As to whether I say now that I did not sign a release, I don't remember whether I did or not. I don't know whether I signed one or not.'

"During the trial the plaintiff, upon finding that his pleadings were insufficient to admit the testimony tending to set aside the check as a release in full, asked leave on February 18, 1913, to file an amended supplemental petition. This was objected to by the defendant, and thereupon an agreement was entered into in open court with regard to the pleading and the facts in this case, which agreement was to be considered in evidence and in construing the allegations of plaintiff's third supplemental petition. This agreement and the circumstances under which it was made is shown by an order of the court. The agreement reads as follows: 'It was agreed by the parties to this suit that for the time lost during February and March, 1911, during which time the plaintiff did not work as section foreman, the defendant was not under any obligation to pay the plaintiff wages as wages, and it could only be liable for said lost time by virtue of some fault or negligence on the part of the defendant; but that if time, whether from injury or sickness or other cause, were lost by the plaintiff, the defendant had the right to deduct such time lost from the plaintiff's wages, subject only to the plaintiff's right to be reimbursed by the defendant for any negligence which inflicted injuries, if any.'

"W. A. Kilgore, a blacksmith at Pflugerville and a disinterested witness in no way connected with the defendant, testified that he knew the plaintiff at the time he was hurt in February, 1912, and was living near the plaintiff; there being one lot between the house of witness and plaintiff. He further testified to having visited the plaintiff at that time. He stated that plaintiff worked for him in August, 1911, for one week, and that he saw plaintiff frequently at night after his injuries. He further testified: 'Mr. Morgan made a statement to me about having made a settlement with the company. To the best of my recollection he made that statement just a short time after he had made the settlement. He and I were talking, and he said he had accepted half time for his trouble and they had made it satisfactory with him.' On cross-examination he testified: 'Mr. Morgan said he had accepted half time for the time he had lost and also for the claim for his injuries. As to what was his claim for his injuries, I don't know whether I can answer that properly or not. He said they settled with him for lost time and also for his injuries. He said he wanted them to pay him full pay and his doctor bill, and they agreed to give him half pay but not his doctor bill, and he accepted half time. He did not tell me the number of days they settled with him for. I went over to his house while he was confined to his bed after the accident. I suppose I saw him from three to six times a day while he was in bed; that is, day and night. He told me about making the settlement just a few days after he had made it. I could not give you the exact date when the settlement was made. He was not working for me then. I was in his home when we were talking about it. His family were there at the time. I do not remember which one of us brought up the matter of their paying him for his lost time.'

"We do not deem it necessary to make a full statement of the testimony of the defendant's employés, as the question before this court is as to the sufficiency of the evidence to set aside the check or draft as a release in full.

"N. G. Rich, the roadmaster referred to in the plaintiff's testimony, who effected the

settlement with the plaintiff, and whose testimony is set out in the statement of facts at pages 31 to 36, testifies substantially to the same as the plaintiff with regard to most of the details of plaintiff's testimony, with the exception that he states that at all times it was understood that the company was settling in full, and that nothing was said about half time or pay for time that was lost, except that, in a case of that character, the policy of the company was to pay half time, based on the time lost, in full settlement of all claims against the company. He further testified that the plaintiff did execute a release at the time he delivered the draft, and that the release was turned over to his clerk. It was shown by the testimony of the witnesses Rankin and McCoughtry and Hyde that the proper search had been made for the release and voucher, but they could not be found, and, if they had been executed, they were lost. These witnesses also explained that the reason three instruments were executed in effecting settlements was that each one went to different departments of the company, for the company's files, the check to the treasurer, the release to the general claim agent, and the voucher to the auditor, as a matter of bookkeeping. The witness Hyde further explained that he had nothing to do with effecting the settlement, except to make out the papers and forward them to Mr. Rich; that, when the papers could not be located, he wrote the letter above set out and inclosed duplicates of the original voucher and release in order to perfect the files of the company in accordance with its usual method of bookkeeping, as shown by his letter.

"G. D. Wells, the section foreman of defendant, testified that, when the plaintiff was working under him as section laborer, he stated that he had settled in full with the company for his injuries.

"W. F. Southern, the agent at Pflugerville, who cashed the draft, and who appeared to be a friend of the plaintiff, testified that plaintiff had discussed the matter of settlement with him, and that plaintiff first wanted his full time and doctor's bill, and afterwards agreed to take half time. This took place before plaintiff received the draft. This witness had no connection with the settlement, further than that he appeared to be a close friend and adviser of plaintiff. He had been asked at one time by Mr. Rich to try to get plaintiff to go to the hospital for treatment, but plaintiff would not go.

"Plaintiff did not contradict any of the statements made by any of these witnesses except as set forth in his testimony above."

### Opinion.

But three assignments are presented in appellant's brief, and these charge that the trial court committed error: (1) In refusing to give a requested instruction directing a verdict for the defendant; (2) in submitting to the jury any question concerning the validity of the settlement set up in the fourth paragraph of the defendant's answer; and (3) in overruling defendant's motion for a new trial, based upon the proposition that there was not sufficient testimony to submit to the jury the issue referred to. Under these assignments, appellant submits the following proposition: "The check being by its terms a settlement of the claim for personal injuries, its operation as a release in full could only be set aside by some evidence of fraud, accident, or mistake. And, there being no evidence in the record warranting the court in submitting either of these issues to the jury, the court therefore committed error: (1) In refusing to instruct the jury peremptorily to return a verdict for defendant; (2) in submitting to the jury as an issue in the cause the validity of the check as a release in full; and (3) in overruling the thirteenth ground in defendant's amended motion for a new trial." We have reached the conclusion that the assignments referred to should be overruled, and deem it proper to briefly state the reasons for that conclusion.

[1] Correctly speaking, the check was not, in law, a release, but if it was accepted by the plaintiff, knowing that it was tendered as a settlement for whatever claim he might have for personal injuries, then such acceptance and his collection of the amount therein named would constitute an accord and satisfaction; and it was so pleaded by appellant. This being the case, we do not think it was necessary for the plaintiff to allege and prove any actual fraud on the part of the defendant, but the trial court submitted the question of fraud to the jury; and appellant contends that the evidence fails to show such fraud.

[2] After a careful consideration of the case, we have reached the conclusion that, if the plaintiff told the truth as a witness, he was misled by the conduct of the defendant's agent Mr. Rich, and accepted the check and money which was paid him thereon under the belief that it was a settlement of his claim for wages only, and not of his claim for damages for personal injuries. And, if such was the fact, then to the extent that he was misled by the conduct of Mr. Rich, a fraud was perpetrated by the latter.

[3] Even if the check had been a formal release, and the plaintiff had been induced to sign the same by fraudulent representations, then, although he could have discovered the fraud by reading the document before signing it, yet his failure to do so would not prevent him from asserting the invalidity of such release. Chatham v. Jones, 69 Tex. 744, 7 S. W. 600; Conn. v. Hagan, 93 Tex. 334, 55 S. W. 323; Mortgage Co. v. Pace, 23 Tex. Civ. App. 222, 56 S. W. 377; W. U. Tel. Co. v. Walck, 161 S. W. 902. But, as said before, the question in this case is: Did the transaction in reference to the acceptance of

the check and the collection of money thereon constitute an accord and satisfaction as to the plaintiff's claim based upon personal injuries? In order for it to have that effect it must appear, as alleged in the defendant's answer, that the parties entered into an agreement by which the plaintiff was to accept the sum of $11 in full settlement of all claims he might have against the defendant arising out of the accident referred to. Now, if the plaintiff told the truth while testifying as a witness, no such agreement was ever entered into, and he did not accept the check and the money he received thereon in pursuance of any such agreement.

[4] There was testimony tending strongly to show that the plaintiff did not tell the truth in that regard, but his credibility and the credibility of the witnesses tending to impeach him was a matter for the jury, and not for this court, to determine.

Judgment affirmed.